O'QUIN *v.* BAPTIST MEMORIAL HOSPITAL.

(*Jackson,* April Term, 1947.)

Opinion filed May 3, 1947.

See, also 182 Tenn. 558, 188 S. W. (2d) 346.

572

W. C. Rodgers, of Memphis, for plaintiff in error.

John W. McCall and McDonald, McDonald & Kuhn, all of Memphis, for defendant in error.

Mr. Justice Prewitt delivered the opinion of the Court.

This is a suit for damages for personal injuries resulting in the death of Clovis Higgins by being shot by two Memphis police officers while a patient of the defendant, Baptist Memorial Hospital. There was a jury trial, and at the close of the plaintiff's proof the court sustained the defendant's motion for a peremptory instruction and dismissed the suit of the plaintiff. On appeal in error to the Court of Appeals that Court reversed the judgment of the trial court, holding that there was evidence of negligence on the part of the hospital. *Certiorari* has been granted and argument heard.

The negligence complained of is that while the deceased, Clovis Higgins, was a pay patient in the hospital and temporarily deranged he was shot by two police officers of the City of Memphis who had been summoned by employees of the hospital to restrain him.

On February 19, 1941, the deceased, a young man about 29 years of age, was brought to the hospital by his father and brother from his home near Forrest City, Arkansas. He was assigned to a room in the hospital late in the afternoon and was in fairly good condition at that time. The record discloses that the deceased was carried to the hospital for treatment of epilepsy, from which he had suffered for some time. His physician in Arkansas advised his father to come to Memphis and consult a prominent diagnostician, resulting in the deceased being placed in the hospital. It seems that after the deceased entered

the hospital sometime during the early part of the night he was given a spinal puncture. The father and brother remained with him. The father was a rather elderly man but the brother was middle-aged, strong, and weighed about 180 pounds. In the early morning about 5 or 5:30 the deceased became restless and unruly and insisted on putting on his clothes, which he did. He thereupon left his room and started down the hall and entered the room of another patient which caused a disturbance, and he then went on down the stairway, and when he reached the ground floor, instead of going out, he went down to the basement, where the heating equipment of the hospital is located. The basement is a large room in which there are three large boilers and a lot of pipes and electrical machinery. After the deceased left his room, his brother undertook to stop him and a scuffle resulted, and the deceased bit his brother on the arm. When the deceased entered the boiler room there were several other people there—employees of the hospital—but Joe Cannon seems to have been the only person who later saw the shooting; the others having left hurriedly. After the scuffle between the deceased and his brother, some one at the hospital telephoned the police department and in about five minutes two policemen appeared and went on down the steps to the boiler room. When the officers arrived the father and brother were at the basement stairway near the entrance to the boiler room, and the father said to the officers that his son was out of his mind and not to hurt him, and the officers replied that they would get him. When the policemen entered the furnace room the deceased picked up an old water pipe about four feet long and struck one of the policemen and broke his arm, and then turned and walked around in the boiler room and advanced on the second policeman, who told

him to stop two or three times, which the deceased did not do but continued to advance on him with the pipe, and when the deceased had reached a distance of about 10 or 12 feet from the second policeman, the latter shot him four or five times and killed him instantly.

It appears that there were two other patients in the room assigned to the deceased, who did not have a special nurse, but his father and brother stayed in the room with him, not as nurses, but to care for him if he needed attention and because they thought he would be better satisfied if they remained with him.

The witness Joe Cannon, fireman at the hospital, was the only eyewitness to the shooting, and he testified substantially to the facts as stated above.

The defendant hospital denies liability (1) because it is a charitable institution and therefore not liable for the negligence of its agents and servants, and (2) also because the policemen were not its agents in the matter wherein deceased lost his life.

The hospital cannot avail itself of the first defense, because the freedom from liability extends no further than the protection of the trust property. *Hammond Post No. 3, Inc., American Legion,* v. *Willis,* 179 Tenn. 226, 165 S. W. (2d) 78. In that case this Court said at pages 232 and 233 of 179 Tenn., at page 80 of 165 S. W. (2d):

"In *Baptist Memorial Hospital* v. *Couillens,* 176 Tenn. 300, 140 S. W. (2d) 1088, 1091, in an opinion by Mr. Justice CHAMBLISS commenting on the rule in other states denying immunity to charitable trusts against torts of their servants, it was said:

" 'However, we are constrained to abide in principle by the rule which this Court has followed since *Abston* v. *Waldon Academy,* 118 Tenn. 24, 102 S. W. 351, 11 L. R. A., (N. S.) 1179, and which is followed by the overwhelming

majority of the Courts in other jurisdictions and adopted in the recent "Restatement of the Law of Trusts",— that a beneficiary of a charitable trust may not subject the trust property to the satisfaction of his claim for tort based on the negligence of its servants. . . . But we feel justified by previous holdings in this State (for example, *Gamble* v. *Vanderbilt University, supra*, [138 Tenn. 616, 200 S. W. 510, L. R. A. 1918C,875,] where an office building was operated for profit) and by modern conditions prompting a changing public policy, in restricting this immunity to such property only as is directly and exclusively used in the operation of the trust, as distinguished from that incidentally held and employed in the effort to earn or provide funds for carrying on the work of the trust.'

"Various reasons have been given for the immunity granted charitable institutions. As said by Chief Justice GREEN in *Lincoln Memorial University* v. *Sutton,* 163 Tenn. 298, 43 S. W. (2d) 195, 196: 'The idea is that the tolerance of such liabilities might eventuate in the destruction of the charity and discourage donors, to the detriment of the public welfare.' "

We are of opinion that the defendant hospital cannot escape liability simply on the ground that it is a charitable institution.

The defendant also contends that the policemen were not its agents when they came to the hospital and took the life of the deceased.

In our view of the case it is not necessary for us to weigh the evidence and determine whether the deceased was making such a deadly assault upon the policemen as would justify the latter in taking his life as the situation appeared to them at the time. This consideration would

only apply if under the facts it appeared that the policemen were the agents of the defendant hospital.

There is nothing in the record before us to justify the statement that the hospital employees were acting in concert with the policemen, or that they were aiding them in carrying out some unlawful act.

■■ The police department is a governmental agency of the City of Memphis; and a municipal corporation is not, in the absence of a statute, liable in damages because of the manner in which its police officers perform or neglect to perform their public duties. White on Negligence of Municipal Corporations, sec. 67; see *Lawrence* v. *Crescent Amusement Co.*, 8 Tenn. App. 216. To hold that every citizen or corporation who calls in the assistance of the police department for quieting disturbances and protecting life and property makes the police officers his or its agent, and liable for the acts of the police officers, would be to seriously impair the usefulness of the police departments and to further the cause of violence. Police officers act in a governmental capacity for whose acts the city is not liable; and it follows that private individuals or corporations are not liable who call police officers in to quiet a disturbance, unless the parties calling them in are a part of some unlawful plan or act and these private persons or corporations do something in furtherance of the unlawful act.

Such does not appear in the present case. The police department of a city owes a duty to generally protect life and property, and when the circumstances justify or appear to justify the summoning of law enforcement officers, this precaution is to be encouraged rather than discouraged by suits. Certainly, the employees did no unlawful act in calling the police officers, and there is nothing here to show that the hospital set in motion any instru-

mentality under its control that brought about the unlawful death of the deceased.

■ The case of *Eichengreen* v. *Louisville & N. Railroad,* 96, Tenn. 229, 34 S. W. 219, 31 L. R. A. 702, 54 Am. St. Rep. 833, is not in point. There the railroad itself, a private corporation, amenable in law for the acts of its employees, and not a governmental agency, set in motion the machinery by which the unlawful act was done. In the present case the police officers were in no sense the agents of the hospital. The fact that the policemen, or either of them, might be personally liable in this case, is no answer to the proposition. While a peace officer may become the agent of one calling for assistance, as where he acts in furtherance of some private objective, yet he cannot be adjudged the agent of one who calls him to aid in preventing a breach of the peace, even though it may be threatened upon private premises. If we should hold otherwise, the result would be that one who calls for a peace officer when violence is threatened would act at the peril of being held liable in damages for every mistake of the officer.

■ The general rule is that a hospital is required to exercise such reasonable care toward a patient as his known condition may require, and the extent and character of this care depends upon the circumstances of each case. 41 C. J. S., Hospitals, sec. 8, p. 349.

It should be borne in mind that the defendant hospital is a general hospital as distinguished from a hospital held out and operated for the treatment of mental patients.

The Court of Appeals in its opinion quoted from the case of *James* v. *Turner et al.,* 184 Tenn. 563, 201 S. W. (2d) 691, in which this Court said: "There is no doubt that the general rule is that voluntary submission to the authority of a sanatorium raises an implied obligation on

its part to give the patient such reasonable care and attention for his safety as his mental and physical condition require. *Wetzel* v. *Omaha Maternity & General Hospital Ass'n*, 96 Neb. 636, 148 N. W. 582, Ann. Cas. 1915B, 1224; *Broz* v. *Omaha Maternity & General Hospital Ass'n*, 96 Neb. 648, 148 N. W. 575, L. R. A. 1915D, 334; *Hogan* v. *Clarksburg Hospital Co.*, 63 W. Va. 84, 59 S. E. 943. When a patient enters a hospital maintained for private profit, he is entitled to such reasonable attention as his safety may require, and, if he is temporarily bereft of reason and is known by the hospital authorities to be in danger of self-destruction, the authorities are in duty bound to use reasonable care to prevent such an act. *Fetzer* v. *Aberdeen Clinic*, 48 S. D. 308, 204 N. W. 364, 39 A. L. R. 1423.''

In that case we held that the defendant sanatorium was not liable, that it had used the care that might be reasonably expected of it, and that it was not an insurer of the safety of James.

. In the instant case the deceased was under the immediate care of his father and brother. He became very unruly and dangerous and entered the room of a near-by female patient. A fight ensued between the deceased and his brother, who was a strong man, resulting in the deceased biting his brother on the arm. We think this was a sufficient cause to summon the police, not only in a general hospital but in a hospital equipped to care for mental patients, and having called in the regular law enforcing officers, the hospital was justified in assuming that these officers would bring about the control and restraint of the dangerous patient. It happened that in the emergency the patient lost his life in the difficulty with the police officers through no fault of the hospital.

██ Viewing the evidence in this case in its most favorable aspect to the plaintiff's contention, we are unable to find any evidence showing negligence on the part of the hospital. It results that the judgment.of the Court of Appeals will be reversed and that of the trial court affirmed.

GAILOR, J., did not participate; CHAMBLISS, C. J., and NEIL and TOMLINSON, J.J., concur.