# WILLIAM H. FORD v. VANDERBILT UNIVERSITY et al.—289 S. W. (2d) 210.

Middle Section. December 2, 1955.

Petition for Certiorari denied by Supreme Court April 5, 1956.

Eugene Jackson, Jr., Nashville, for plaintiff.

Bass, Berry & Sims, Nashville, for defendant.

I

SHRIVER, J. The parties will be referred to as plaintiff and defendant as they appeared in the Court below. The plaintiff, William H. Ford, sued the defendants Vanderbilt University, The Board of Hospital Commissioners and the City of Nashville, for $20,000 damages on account of personal injuries sustained by him on or about July 11, 1954, while a patient at the Nashville General Hospital.

The case was tried before the Hon. E. F. Langford and a jury in the Third Circuit Court of Davidson County, Tenn. At the conclusion of all the evidence, the trial Court sustained defendants' motion for peremptory instructions, and dismissed plaintiff's suit. Plaintiff in due time moved for a new trial, which motion was overruled and the case properly appealed in error to this Court.

## II

### Assignments of Error

There are four assignments of error but they simply raise the question whether or not the trial Court erred in sustaining the defendants' motion for peremptory instructions made at the conclusion of all the evidence.

## III

Plaintiff charged in his declaration that the defendants were guilty of negligence in several respects: (1) in not providing side-boards or appliances to the bed to prevent the plaintiff from falling while in a drowsy or delirious condition, (2) in failing to do whatever was reasonably necessary to keep plaintiff safe in bed when he was under the influence of drugs so that he had no control over himself, (3) in refusing his wife permission to stay with him while he was in a delirious condition, (4) in failing to assign him adequate or efficient nursing care and attention, (5) and otherwise, in failing to do the things that a reasonably prudent person would have done under the circumstances to avoid or prevent the injury complained of.

The defendants filed pleas of general issue and, upon the issues thus drawn, the case went to trial before the Judge and a jury, with the result that the Court directed a verdict for the defendants at the conclusion of all the proof.

## IV

In considering the question presented here, the applicable rule is, that when a given state of facts is such that reasonable men may differ upon the question as to

whether or not defendant was guilty of negligence, the determination of the matter is for the jury, and it is only where facts are such that all reasonable men must draw the same conclusion from them, that the question of negligence is considered one of law for the Court. See Hall v. Nash, 184 Tenn. 312, 198 S. W. (2d) 649.

■ The record shows that William H. Ford, a man 46 years old, suffering with a chronic condition of asthma, went to the Vanderbilt Hospital in June 1954 where he was given some medicines and then directed to go to the Nashville General Hospital which was being operated at the time by Vanderbilt under a contract with the City of Nashville.

Plaintiff was admitted to the Hospital as a paying patient.

At times when his asthmatic and heart condition were giving him trouble, he had difficulty in breathing if he lay down in bed. He was, therefore, compelled to sit up or have his head elevated a good deal of the time.

He was given phenobarbital, digitalis and chloral hydrate, generally at night, though he was administered some medicine during the daytime.

He weighed only about 115 pounds, but was given a dose of phenobarbital for an average man and this, generally, was expected to have a sedative effect for some 4 to 6 hours. Phenobarbital is a drug that can produce hypnosis, as was testified to by Dr. Burris (R. p. 117). It usually causes drowsiness for several hours.

Also chloral hydrate is a drug that causes drowsiness for 4, 5 or 6 hours.

He was given more than the average dose of chloral hydrate according to the testimony of Dr. Grissim.

He had received both chloral hydrate and phenobarbital at 9 o'clock on the night of his injuries.

As was stated by Dr. Grissim (one of the hospital staff) they knew that it was possible that plaintiff might fall because of his condition and because of these drugs.

There was ample evidence that the plaintiff was not rational or normal after being administered these drugs. The record is to the effect that the plaintiff was usually normal during the daytime but at night he was not.

The plaintiff testified that he was not exactly normal after taking these drugs and that, on one occasion, he fell and was on the floor in water and broken glass when the nurses came in and found him and that they told him that he had better stay in bed, otherwise he would get hurt. He also testified that the fall which caused his broken hip was the fourth one that he had had after he went to the hospital and that, on two of these occasions, the nurse or orderly knew about it.

Mr. John Brinkley, who was a patient in the room with the plaintiff during part of the time he was there, testified that, in the daytime he appeared to be as rational as any one, but at night he was more like a drunk man; that he would stumble around and mumble and would try to get in his bed and couldn't, and then he would go to the bath room and sit out there for long periods of time, then come back, and he would have to hold to the bed to get in it. That some times he would go to the bath room

and come back by himself and some times others would have to go and help him back.

His wife testified that he talked irrationally at times, while in the hospital.

Mr. William Eden was also a patient in the same room with the plaintiff, and was there at the time of the injury. He stated that plaintiff was perfectly all right through the day but, to use his words, "When night came on, I don't know whether they gave him something or not, he was all right through the day, but every night he just fogged up, it seemed like."

And, in answer to the question as to what the plaintiff acted like at night, he answered, "He was just staggering. He went to the bathroom, that is when I noticed him."

"Q. You say he staggered? A. Yes; sir, more or less like a drunk man, I would say."

This witness, Eden, also testified that the plaintiff fell off the bed before the night of the accident in question. When asked if he saw that, he answered, "He knocked the oxygen tank over and a table and I never will forget what the orderly said" (he then quoted what the orderly said which was objected to). He was then asked, "Who got the plaintiff up on that occasion?" and the answer was, "The orderly and the nurse."

He was then asked by the Court if he saw the plaintiff fall out of bed at any time, and he answered, "Yes, sir, I saw him two different times."

He was asked who helped the plaintiff up, if anybody, on those occasions, to which he replied, "One time the nurse and orderly got him up. The next time didn't any-

body get him up. He finally got up in the chair himself, and this was the time that he broke his hip." ·

In describing the fall which caused the injury, this witness stated, "I tell you, he had been sitting there on the side of the bed like this, and I had asked him twice to get back in bed, and I finally said, 'Ford, you get back in there and lay down,' and he got up and when he got up, he just headed like that, more looked to me like on to his head."

"Q. On to the floor? A. Yes, sir.

"Q. Was that when he broke his hip? A. Yes, sir."

This witness was then asked, this question, "After he fell, what next took place?

"A. Well, the nurse, of course it made a right smart little racket, and the nurse came in and he was down in the floor at that time, and I said, 'Mr. Ford fell off the bed again,' and she said, 'Mr. Ford, get back up on the bed and lay down.'

"Q. You told her that he had fallen off the bed again? A. Yes, sir, I said, 'He fell off the bed again.' She turned around and went out and there was a chair here, and he kind of got hold of the arm of the chair and bed together and got up in the chair, and so he just kept sitting there and sitting there, and directly I said, 'Mr. Ford, why don't you lay down,' and he said, 'I am hurting.'"

He was asked the question, "Do you know what time it was when he fell?

"A. Well, just about around between 11:30 and 12:00. It was before they changed shifts, as I remember, because the nurses came in.

"Q. Right after midnight, one way or the other? A. Yes, sir.

"Q. Do you know about how much later it was that the nurse came in and went back out? A. No, sir, I just couldn't say.

"Q. You don't know. A. No, sir.

"Q. After she went out, how much later was it when someone returned to the room? A. I don't think before around 6:00 o'clock the next morning.

"Q. About 6:00 the next morning? A. Yes, sir.

"Q. During that period of time, what did Mr. Ford do for himself, what did you see him do? A. He just waked up. He waked me up.

"Q. Tell what he did after he fell out? A. He just sat in the chair that is all."

The witness described the scene when the nurse came in the next morning to get the plaintiff back in bed and found him hurt, she went and got an orderly and they did help him in bed and called a doctor. He was then x-rayed and found to have a broken hip.

There is evidence in the record to the effect that the light or the switch on the plaintiff's bed, by which he might have summoned aid, was broken from the time he went in the hospital until he left it a month later.

Again the record shows that the bed assigned to this patient was about three feet high, that is, it stood some

three feet from the floor, which was a hard marble floor, with no covering on it.

There were no side rails or any other appliances, or devices, to keep this patient in bed while he was in a delirious condition.

It was testified to by the doctors who were witnesses for the defense, that, in treating patients with asthma and conditions such as this patient had, it was oftentimes regarded as detrimental to them to restrain them, since restraint might have an adverse psychological effect.

It is also strenuously insisted by counsel for defendant that there is no evidence that the decision of the doctors in this case, based on their medical judgment, was contrary to the best known practice of the medical profession.

## V

If we concede that there is no evidence that the decision of the doctors in this case, based on their medical judgment, was contrary to the best known practice of the medical profession, we still have not entirely answered the question posed here.

It seems to the Court that it is not entirely a medical question. Physical factors and common sense enter into a consideration of the question before the Court.

If it be further conceded that this is a case in which it would have been psychologically detrimental to the patient to confine him to his bed with side-rails or other devices, nevertheless, there might be a difference of opinion as to whether some psychological disadvantage by reason of restraint, was outweighed by the physical necessity of preventing serious injury.

Then too, if it was a psychological hazard to restrain the patient while he was normal, and had his wits about him, nevertheless, the question arises as to whether or not it would have been proper, and, in exercise of ordinary care, necessary, to put siderails, on the bed, or use some other device, to prevent his falling to the floor after the medicines were administered to him, as they customarily were about 9 o'clock at night, and after these medicines had the effect of rendering him irrational. It cannot be successfully claimed that the psychological effect of restraints would have been the same after the drugs took effect, as before.

There is the further question as to whether or not the hospital authorities exercised reasonable care for the safety of plaintiff by putting him in a high bed, some three feet from the hard marble floor, when they knew that he was likely to fall, as the defendants' evidence admits, when it would have been possible to have furnished him a bed that was closer to the floor, thus rendering his position less hazardous.

There is no evidence that would necessarily contradict the proposition that, as a matter of common sense, a man who is likely to fall off a high bed onto a hard floor, might not be put on a bed closer to the floor, thereby reducing the chance of serious injury.

Then again, the fact that the signal light by which plaintiff might have called for assistance, was out of order and remained so during his stay, may or may not have been a contributing factor in this case as showing want of due care on the part of the defendant.

And, finally, the fact that he had fallen three or four times prior to the occasion when he was seriously injured,

which fact was known to the nurses, orderlies and other hospital attaches, lends weight to plaintiff's insistence that actionable negligence was shown. This taken together with the fact, as testified to by plaintiff and his witnesses, that, after his fall, a nurse some time later discovered him and was told that he had fallen, whereupon she simply told him to get back in bed, without examining him to see whether he was hurt or not, and left him lying there for hours before his injury was discovered, lends weight to the plaintiff's contention that due care was not exercised in his behalf by defendant.

In Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450, it was held:

"Knowledge that patient was suffering from high fever with attendant delirium was sufficient to raise duty upon hospital to protect patient against risk of getting out of bed and harming himself."

"Generally a hospital is required to exercise such reasonable care toward a patient as his known condition may require, and the extent and character of this care depends upon the circumstances."

On page 23, 31 Tenn. App., page 455, 211 S. W. (2d), the opinion states:

"In O'Quin v. Baptist Memorial Hospital, supra [184 Tenn. 570, 201 S. W. (2d) 694], our Supreme Court stated the duty of such a hospital in these words: 'The general rule is that a hospital is required to exercise such reasonable care toward a patient as his known condition may require, and the extent and character of this care depends upon the circumstances of each case. 41 C. J. S., Hospitals, sec. 8, page 349.' "

In James v. Turner, 184 Tenn. 563, 201 S. W. (2d) 691, it was held:

"Physicians who operated sanitarium for mental and nervous diseases, and who received a patient with knowledge that he was in a highly nervous condition and had threatened suicide, owed him the duty of exercising reasonable care for his safety, the degree of care depending on the circumstances."

"Generally, voluntary submission to authority of a sanitarium raises an implied obligation on part of sanitarium to give patient such reasonable care and attention for his safety as his mental and physical condition require."

Giving the plaintiff the benefit of all the legitimate inferences of fact which might be reasonably drawn from the evidence, tending to support his cause of action, we are of opinion that it was error to direct a verdict for the defendant.

The trial Court is reversed and the cause will be remanded for a new trial.

The defendants will pay the costs of this appeal.

Reversed and remanded.

Felts, P. J., (Middle Section) and Hickerson, J., concur.