Mary Louise Thompson et al.

*v.*

Methodist Hospital.

367 S. W. 2d 134.

(*Jackson,* April Term, 1962.)

Opinion filed November 9, 1962.

Rehearing Denied April 3, 1963.

Lucius Burch, Jr., Tom Mitchell, Jr., Wm. H. Fisher, III, Memphis, for plaintiffs in error.

.FITZHUGH & CLAY, Memphis, for defendant in error.

MR. JUSTICE DYER delivered the opinion of the Court.

Mrs. Mary Louise Thompson, her husband, Robert, and their new born infant, Terry, brought separate suits against the Methodist Hospital at Memphis for injuries alleged to have been suffered from an infection known as staphylococcus aureus. It causes painful and deep seated boils. The theory of each declaration is that the baby contracted this infection after being born in the hospital and through him, the germ was transmitted to the mother and through the two, to the father. Total damages of $25,000.00 were awarded in the three cases consolidated for trial. The Court of Appeals set aside the judgment entered thereon, and dismissed each of the cases. Its ac-

tion was based on its conclusion of no substantial evidence of causal connection between the alleged negligence, if such there was, of the hospital and these infections.

We granted certiorari in this case out of respect this Court has for a jury verdict concurred in by the Trial Judge, without regard to the merits of the opinion of the Court of Appeals. We have heard very able arguments before the bar of this Court and considered the matter for considerable time due to the importance we attach to it for the purpose of determining whether the verdict is supported by any substantial evidence. If so, the judgment of the Trial Court must be restored.

There are many types of this ailment. Some eight or ten types thereof are infectious and resistant to antibiotics. One of these is known as "Hospital Staph" because it is found more frequently in, than out of, hospitals. At the time in question here a number of infections had occurred to mothers and babies out of hospitals in Memphis as well as in its hospitals.

Mrs. Thompson entered the hospital on February 28, 1958. The baby was born that day. The mother and baby went home on March 3, 1958. When they were taken home, the father noticed certain rash and pimples here and there upon the body of the infant. In the course of some days, these became worse. The child was nursed by its mother and she became afflicted. In the course of some days the father also became afflicted. It was the statement of the Administrator of the hospital that the baby contracted the infection in the hospital. Of course that was only his opinion.

Nevertheless, this Court, considering all of the above testimony, concludes that there is substantial evi-

dence to the effect that the baby contracted this infection while in the hospital and that his mother and father contracted it as a result.

All the evidence is that this infection has been a problem from time immemorial. One doctor said for a thousand years. The undisputed evidence further is that it may, and does, occur in, and out of, hospitals, and may occur without the slightest negligence upon the part of anyone. The germ is carried by countless numbers of people in and out of hospitals, on the streets, and without knowledge upon their part that they are carriers.

Sometime from the middle to the last of 1957, this malady made a more frequent appearance in, and out of, hospitals in Memphis. This resulted in a tightening up of aseptic techniques and as a part of such technique, in the early part of 1958 or late 1957, doctors and hospitals began to take cultures from the noses and throats of the personnel at hospitals.

Some four to eight persons in the Methodist Hospital were thereby discovered to be carriers. Among them was an intern by the name of Dr. Holmes. The theory of the plaintiffs is that it could be found that Dr. Holmes conveyed this disease to the baby. The evidence is that Dr. Holmes did make an examination of Mrs. Thompson when she entered the hospital, but there is no evidence that Dr. Holmes ever came in contact with this baby. The insistence of the plaintiffs is that every baby born free of this infectious germ, and that this particular baby, after birth, acquired it and caused it to be given to his mother.

A lady by the name of Watson, a practical nurse, with duties consistent therewith, appeared from time to time

in the hospital with a boil. When that was made known to her superior, she was at once sent home and required to remain there until her doctor had discharged her as having been "cured." She was in the new-born nursery for three days during her stay of more than a year at the hospital. There is no evidence that this baby at anytime was exposed to her, or that she was in this nursery during his stay there.

Moreover, the fact that the hospital did not discover the condition of Dr. Holmes, or the situation of Mrs. Watson except as above related, is not evidence of any negligence upon the part of that hospital. The taking of these cultures was a new step in the long and not entirely successful fight against this ailment.

A trained nurse in the hospital by the name of Epstein testified to certain conduct of personnel she had seen in the labor section which was not in keeping with aseptic techniques. Mrs. Watson likewise gave testimony to that effect. All the evidence is that these were infractions of the rules of the hospital. No one of the other very many employees or doctors observed these violations.

The conclusion is inescapable that the acts to which these witnesses testified were occasional violations of the rules rather than the practice in this hospital. It must be recognized that some occasional violations of the rules of a large hospital employing a large number of people will occur without regard to how strict the hospital is in the enforcement of its rules. There is no evidence that any of these violations occurred during the time Mrs. Thompson and her baby were there. As a matter of fact, Mrs. Epstein, a few months after leaving the hospital, reentered to give birth to her baby. She explains that

they were in a new wing of the hospital at that time. The inevitable conclusion from that testimony is that Mrs. Epstein had full confidence in the personnel of the hospital, but that its physical arrangement, prior to the completion of the new wing, made its situation somewhat difficult.

More mothers, perhaps twice as many, go to the Methodist Hospital rather than some other Memphis hospital, for the birth of their babies. Eight or ten are born there each day.

The record discloses that its personnel consists of some eighty to eighty-five employees. These employees, in accordance with the duties assigned to them, are highly skilled, and thoroughly trained for the duties to which they are assigned, and are dedicated people. They are the equal in ability, training and technical education to those in any Memphis hospital.

When this infection began to make itself somewhat evident in another hospital in Memphis in the latter part of 1957, the doctor in charge of that hospital conferred with the supervisor of the new-born nursery of the Methodist Hospital as to methods the latter pursued with reference to the care of infants born there, and aseptic techniques followed there. He consulted the supervisor in the Methodist Hospital because of his great respect for her knowledge and ability. This doctor testifies that he followed the rules which this supervisor informed him were being practiced in the Methodist Hospital.

With one exception, every doctor testifying in this case, unequivocally stated that the aseptic technique, the care, skill and diligence used by the Methodist Hospital in its

new-born nursery and in its entire obstetrical department were up to the standards prevailing in any hospital in Memphis, and better than in some of them. The one exception was a doctor who had not been in the Methodist Hospital since 1951, and who actually an instructor and who gave no testimony upon the point mentioned. It may here be observed that the care and procedure followed in the Methodist Hospital is shown in great detail—it is not disputed. Nothing is to be gained by stating it here except that it is impressive.

The original plaintiffs in this case concede that their case is based upon circumstantial evidence. The circumstances hereinbefore stated do not, in the opinion of this Court, furnish any evidence of negligence upon the part of the hospital at the time this baby was there, or that such negligence, if any, was the cause of this baby's infection. In one of their briefs, it is stated that:

"There is no single act of negligence by the defendant * * * which was the sole proximate cause of plaintiff's infections, but the defendant's failure to exclude infected personnel and carriers of hospital staph strains from its nursery and obstetrical department before and during the time plaintiffs were patients in the defendant hospital was certainly of prime importance in the causation of plaintiff's infections."

The above remark refers, of course, to the failure of the hospital to discover that Dr. Holmes and perhaps Mrs. Watson and one or two others were carriers of the disease. As heretofore stated, there is no evidence that these employees ever came in contact with this baby. Nor was it the practice until about this time to take cultures for the purpose of determining who were carriers. More-

over, a hundred or so outside people who may have been carriers necessarily entered the obstetrical department during the few days that Mrs. Thompson and her baby were there, and without any possible way for the hospital to know they were carirers.

The plaintiffs principally rely upon certain rules and regulations designed to lessen, insofar as they could, the obtaining of this infection. These rules and regulations were prepared by a Dr. Wheeler and Associates in 1954, and revised perhaps in 1958. So far as the record discloses, they became known in Memphis sometime in 1957 or 1958. These rules are entitled, "Standards and Recommendations for Hospital Care of New Born Infants, Full Term and Premature." Dr. Wheeler resided in a state and city which this Court does not at this time recall, but this is immaterial.

Dr. Wheeler admits that the complete adherence to these rules would not totally prevent the occurrence of this affliction; that in fact it has occurred in his own hospital. Without discussing in detail the rules and regulations so recommended, it is sufficient to say that these rules and regulations, if they could be absolutely followed, present a hospital Utopia, but would not entirely prevent this ailment in such a Utopia. The uncontradicted evidence is that no hospital of the usual endowments, funds and facilities could possibly comply with these rules. Nor is it necessary to do so.

By way of extreme illustration, it is shown that at the Methodist Hospital porters enter certain portions of the obstetrical department for the purpose of taking out bags of soiled linen. These bags are too heavy for the nurses to handle. One of the personnel of the hospital called as

a witness for the plaintiffs was asked by the plaintiffs this:

"Does the porter take a bath before he goes in every time?"

meaning the entering of the delivery area from the labor room to remove the heavy cases of soiled linen. The reply of the witness, who was a supervisor in one of the obstetrical divisions, was that such porter:

"is garbed * * * in the proper things; that he puts on a cap, a mask and a gown and washes his hands when he goes in."

Obviously it would be impossible in the average hospital to make such a requirement of the porter. Many other such recommendations are contained in Dr. Wheeler's book of rules. The above is related for the purpose of showing the extremely far range of the evidence submitted at the insistence of the plaintiffs to the jury in this case.

As stated, some eight to ten babies are born in this hospital each day. Taking into consideration the fact that the babies remain there for some four or five days, it would mean that always there are from thirty-two to forty babies in the new-born nursery at a time. The practice in this hospital, as well as all others in Memphis, with one exception, was to carry the babies for feeding six times a day in a vehicle known as a carrier. Each baby was separated from the other in this carrier by a partition which is at least several inches above the body of each baby. One of the recommendations of Dr. Wheeler's book of regulations is that each baby should be carried separately to its mother by a nurse, who returns and

washes her hands, etc. and then carries another baby to its mother, with same procedure followed each time. This would require some 240 to 300 trips the nurses would have to take each day for this one service alone. It is obviously impractical. The proof shows, without dispute, that this hospital does not have the personnel to carry out any such procedure and could not obtain that many nurses, considering the shortage which exists, and assuming it could be financially afforded in the average hospital. And it is said every hospital in Memphis, with the exception of one small one, follows the procedure practiced by the Methodist in carrying the babies to their mothers each six hours for feeding. Numerous other extreme recommendations of Dr. Wheeler's rules might be mentioned, but it is not necessary in this opinion.

One of the clearest statements which this court finds as to the duty of a hospital within the premises is that stated in 41 C.J.S. sec. 8, page 349 under the title "Hospitals." That statement is this:

"The measure of duty of a hospital is to exercise that degree of care, skill, and diligence used by hospitals generally in that community, and required by the express or implied contract of the undertaking."

The conclusion of this Court is that the degree of care exercised by the Methodist Hospital at the time in question here meets in every detail that requirement. Every doctor who testifies as to this so stated.

Applicable here is the ruling of this Court with reference to a doctor in the case of *Quinley v. Cocke et al.,* 183 Tenn. 428, 440-441, 192 S.W.2d 992, 997, wherein the Court said:

"The records before us, including the statement of Dr. Lipscomb, show that accidents such as the plaintiff sustained do occur even when the treatment is properly administered. It is not material that they occur often or infrequently. If we apply the rule of presumed negligence, res ipsa loquitur, in cases of this kind, the physician and surgeon would always be in fear of the result of a scientific treatment knowing that he might have to defend his professional reputation in open court. In these circumstances the words of Mr. Chief Justice Taft (while on the United States Circuit Court of Appeals) are most appropriate: 'Few would be courageous enough to practice the healing art.'"

As heretofore noted, the undisputed evidence is that these infections occur in and out of hospitals, and in the absence of negligence. If, under the evidence in this case the Methodist Hospital is to be held liable for the infection contracted by the Thompson baby and transmitted by him to his parents, then few hospitals could reasonably incur the financial risks of having born within its walls a baby.

To this Court it seems obvious that if the Methodist Hospital is to be held responsible in this case, notwithstanding the undisputed evidence as to the skill and care it exercised in the care of new born babies, it could have the effect of closing the obstetrical department of every hospital in the state.

Also applicable to this case is the holding of the California Court in *Huffman v. Lindquist,* 37 Cal.2d 465, 234 P.2d 34, reported in 29 A.L.R.2d 486. There the Court, after reviewing the charges of negligence made against the hospital, stated at pages 497-498:

"* * * The record does not disclose any causal connection between the alleged negligent conduct and the boy's death * * *

"It must be conceded that the hospital's failure to have its pulmotors in working order might constitute actionable negligence under some circumstances, but there is no evidence that such failure was the proximate cause of the boy's death * * * and the doctrine res ipsa loquitur is entirely inapplicable; hence, there was no error in granting the non-suit in favor of defendant hospital."

Recognizing the isloated instances of violation of the hospital's rules, as testified to by two of its personnel and concluding, as we must, that these were exceptions to, and violations of, the rules of the hospital and that there is no evidence that these isolated instances of violation occurred while this baby was there, it must be concluded that there is no substantial evidence of negligence upon the part of this hospital in connection with this baby's infection.

But if we assume such negligence, there is, nevertheless, applicable this statement in *Memphis Street Railway Company v. Cavell*, 135 Tenn. 462, 469, 187 S.W. 179, 181 to-wit:

"If there is any other cause apparent to which the injury may with equal fairness be attributed, the inference of negligence cannot be drawn."

The undisputed evidence in this case is that the infection of the Thompson baby may as well be attributed to some cause other than isolated instances of negligence upon the part of some of the personnel of the institution, and

in no way connected by the proof with baby Thompson's infection, an infection which may be contracted without negligence upon the part of any one or from one of many different sources for which the hospital is not responsible.

As said by this court in *De Glopper v. Railway and Light Company*, 123 Tenn. 633, 648, 134 S.W. 609, 613, 33 L.R.A.,N.S., 913, if we assume any negligence on the part of this hospital, nevertheless:

"What caused the injury, and the defendant's negligent connection with it, are left entirely at large by the proof, and are matters of pure conjecture. Under all the cases cited this is not sufficient."

The action of the Court of Appeals in setting aside the judgment of the Circuit Court and ordering dismissal of each of the three cases, and assessing costs to the plaintiffs and the surety on the appeal bond of Mary Louise Thompson, is affirmed.