**James L. WHITE, Plaintiff-Appellee,**

v.

**BAPTIST MEMORIAL HOSPITAL,**
**Defendant-Appellant.**

**No. 16480.**

United States Court of Appeals
Sixth Circuit.

July 19, 1966.

Richmond M. Flowers, Atty. Gen., John C. Tyson, III, Asst. Atty. Gen., Montgomery, Ala., for appellee.

Before TUTTLE, Chief Judge, and BROWN and COLEMAN, Circuit Judges.

Crawford McDonald, Memphis, Tenn., W. P. McDonald, Jr., Memphis, Tenn., on brief; McDonald, Kuhn, McDonald, Crenshaw & Smith, Memphis, Tenn., of counsel, for appellant.

Paul W. Denton, Memphis, Tenn., for appellee.

Before O'SULLIVAN and PHILLIPS, Circuit Judges, and WILSON,[1] District Judge.

FRANK W. WILSON, District Judge.

This case involves an action for personal injury brought in the United States District Court for the Western District of Tennessee, Western Division. From a judgment for plaintiff based upon a jury verdict, the defendant has prosecuted this appeal.

The plaintiff-appellee was admitted as a patient in the defendant-appellant, Baptist Memorial Hospital, Memphis, Tennessee, on February 10, 1964, for the purpose of surgery upon an intestinal condition. On February 14, 1964, at approximately 4:15 a. m. the plaintiff fell while alone in his hospital room and sustained injuries upon which his suit was founded, including a fracture of the left hip. At the close of the plaintiff's proof and again at the close of all the proof the defendant moved for a directed verdict. These motions were overruled. After a jury verdict for the plaintiff, the defendant moved for judgment notwithstanding the verdict and this motion was likewise overruled.

On appeal, the defendant below asserts 1) that the trial court erred in overruling its motion for directed verdict at the close of the proof and for judgment notwithstanding the verdict on the grounds that there was no substantial evidence that the defendant failed to exercise the degree of care, skill, and diligence used by hospitals generally in that community with respect to the patient and that the defendant failed to maintain its premises in a reasonably safe condition for the patient, and 2) that the trial court erred in instructing the jury that the defendant hospital might be negligent in not providing siderails or other restraint on plaintiff's bed to prevent him from falling therefrom, or in not assigning adequate nursing care to plaintiff to prevent him from falling from the bed or from falling while walking, therein defining negligence as failure to meet the standard of conduct of the ordinarily prudent person rather than as the failure to exercise that degree of care, skill and diligence used by hospitals generally in the community with respect to patient care.

As noted above, one issue raised upon this appeal is the standard of care imposed in Tennessee upon hospitals with respect to patient care. The Tennessee cases in this area are not readily reconcilable.

The most recent of the Tennessee cases is Thompson v. Methodist Hospital, 1963, 211 Tenn. 650, 367 S.W.2d 134, in which the Tennessee Supreme Court said:

"One of the clearest statements which this court finds as to the duty of a hospital within the premises is that stated in 41 C.J.S. § 8, page 349 under the title 'Hospitals'. That statement is this:

'The measure of duty of a hospital is to exercise that degree of care, skill, and diligence used by hospitals generally in that community, and required by the express or implied contract of the undertaking.' "

Thompson was an action wherein the plaintiffs sought to recover for injuries resulting from the infection staphylococcus aureaus on the theory that the plaintiff infant had contracted this infection at the defendant hospital shortly after birth and had communicated the same to his parents, also plaintiffs. The Court concluded that the evidence showed that this had in fact happened but that there was no evidence of any negligence on the part of the hospital having any causal relation to the communication of the disease to plaintiffs. It was observed

I. Honorable Frank W. Wilson, United States District Judge, E.D., Tennessee, sitting by designation.

by the Court that staph had been a problem in hospitals for hundreds of years and might occur without negligence on the part of anyone, and that there was no evidence that the defendant's procedures, skill and diligence were not up to the standard prevailing in other Memphis hospitals or reasonably to be expected from the average hospital. The action of the Court of Appeals setting aside the jury verdict and ordering dismissal was affirmed.

The Court in *Thompson* made no reference to other Tennessee cases concerning the standard of care to which a hospital is bound. Prior to *Thompson* no Tennessee court had spoken of a "professional" standard. Rather it had been said in a series of cases that a hospital is required to exercise such reasonable care toward a patient as his known condition may require and the extent and character of this care depends upon the circumstances of each case. This line of cases is well represented by Ford v. Vanderbilt University et al., 1955, 40 Tenn. App. 87, 289 S.W.2d 210, cert. den. There the plaintiff-patient was an asthmatic and a patient in the defendant hospital. Phenobarbital, digitalis and chloral hydrate had been prescribed for him and were given to him, generally at night, though he did receive some in the daytime. There was evidence that these drugs generally cause drowsiness and sometimes hypnosis. The plaintiff was placed in a bed three feet above a marble floor. He had fallen three times prior to the fall in which he was injured and on two of these occasions a nurse or orderly knew of the fall shortly after it happened. The other occupant of the room was present on the occasion of the fall which caused the injuries sued upon, and testified that the plaintiff was frequently "fogged up" at night and would stagger as if drunk. In reversing the action of the trial court in directing a verdict for defendants, the Middle Section of the Court of Appeals stated:

"If we concede that there is no evidence that the decision of the doctors in this case, based on their medical judgment, was contrary to the best known practice of the medical profession, we still have not entirely answered the question posed here.

"It seems to the Court that it is not entirely a medical question. Physical factors and common sense enter into a consideration of the question before the Court."

After observing that there could be a difference of opinion as to whether the psychological hazard of restraining a patient might be outweighed by the physical necessity of preventing serious injury, especially during the patient's irrational periods, and as to whether the hospital exercised reasonable care in putting plaintiff in a high bed above a hard floor, and whether or not the absence of an operational signal light, together with the inattention of the hospital employees after an awareness of his previous falls, evidenced a want of due care; the Court went on to review some of the Tennessee cases:

"In Spivey v. St. Thomas Hospital, 31 Tenn.App. 12, 211 S.W.2d 450, it was held:

'Knowledge that the patient was suffering from high fever with attend- and delirium was sufficient to raise duty upon hospital to protect patient against risk of getting out of bed and harming himself.'

'Generally a hospital is required to exercise such reasonable care toward a patient as his known condition may require, and the extent and character of this care depends upon the circumstances.'

"On page 23 of 31 Tenn.App., page 455 of 211 S.W.2d, the opinion states:

'In O'Quin v. Baptist Memorial Hospital, supra [184 Tenn. 570, 201 S.W. 2d 694], our Supreme Court stated the duty of such a hospital in these words: "The general rule is that a hospital is required to exercise such reasonable care toward a patient as his known condition may require, and the extent and character of this care depends upon the circumstances of

each case. 41 C.J.S., Hospitals, § 8, page 349" ' ".

"In James v. Turner, 184 Tenn. 563, 201 S.W.2d 691, it was held:

'Physicians who operated sanitarium for mental and nervous diseases, and who received a patient with knowledge that he was in a highly nervous condition and had threatened suicide, owed him the duty of exercising reasonable care for his safety, the degree of care depending on the circumstances.'

'Generally, voluntary submission to authority of a sanitarium raises an implied obligation on part of sanitarium to give patient such reasonable care and attention for his safety as his mental and physical condition require.' "

In both Spivey v. St. Thomas Hospital, supra, and Rural Education Association, Inc. v. Anderson, 1953, 37 Tenn.App. 209, 261 S.W.2d 151, cert. den., it was held that the circumstances "were sufficient to raise a duty upon defendant to use reasonable care to protect this patient against the danger of his getting out of bed and harming himself, and to make it a question for the jury whether defendant breached this duty." See 37 Tenn. App. 209, at 216, 261 S.W.2d 151, at 154. In *Spivey*, the patient was suffering from pneumonia and was occasionally rendered delirious by a high temperature, and this was known to hospital employees. The patient in *Anderson* was seriously ill and suffering from mental derangement. Conversely, in Nelson v. Rural Education Association, 23 Tenn.App. 409, 134 S.W.2d 181, where the patient was on one of his numerous stays in the hospital for treatment of a condition resulting from excessive use of alcohol and to improve his physical condition preparatory to surgery and became intoxicated and assaulted an employee of the hospital who retaliated, breaking the patient's jaw, the Court held the injury unforeseeable, although it did subscribe to the general rule that the hospital owed to its patients such reasonable care and attention for their safety as their known mental and physical condition reasonably required. See also James v. Turner, supra.

Appellant contends "that hospitals in Tennessee fall under the professional standard cannot be in doubt", citing *Thompson,* and that a higher duty of "ordinary care" or "common sense" is "required by the express or implied contract of the undertaking" *only* where there is evidence of a known condition of the patient rendering him unable to care for himself, such as lack of consciousness, delirium or mental derangement, so that injury might be contemplated.

On the other hand, the appellee urges that the Tennessee courts have implicitly adopted a "professional-custodial" dichotomy. That is, where the professional duties of a hospital are in question, those things "the proper doing of which requires a substantial degree of special training," the measure of care required is merely the degree of care used by other hospitals in the community generally, but where the custodial duties of the hospital are in question, maintenance of the patient in a physically safe environment and under adequate surveillance considering his condition, the measure of care is a "common sense" standard or that of ordinary care. The appellee also contends that, if the analysis advanced by appellant is correct, nevertheless, in the instant case, the circumstances were such as to raise a duty upon the appellant to go beyond the degree of care generally exercised in the hospitals in the community and use "common sense".

Many cases have stated simply that a hospital is required to render such care to a patient as it knew, or in the exercise of reasonable care, should have known, the patient's condition required, and that such duty is measured by the degree of care, skill, and diligence customarily exercised by hospitals in the community, without discussion of any possible conflict. See, for example, Baker v. United States, CA8, 1965, 343 F.2d 222, and Garfield Memorial Hospital v. Marshall, 92 U.S.App.D.C. 234, 204 F.2d 721, 37 A.L. R.2d 1270. On the other hand, incon-

sistency was recognized in Hayhurst v. Boyd Hospital, 1927, 43 Idaho 661, 254 P. 528, discussed at 124 A.L.R. 188 and 70 A.L.R.2d 378. There the negligence alleged was the act of a nurse in placing the patient near a window whereby the patient developed pneumonia. The court held the "professional" standard inapplicable since no professional skill or learning was necessary for the nurse to know that exposure was a menace to the patient's health, and instead applied the rule that a hospital owes a duty to use such reasonable care in looking after the patient as the patient's known condition might require.

Under our view of the evidence in this case however, it is not incumbent upon this Court to resolve the apparent conflict within the Tennessee cases upon the standard of care imposed upon hospitals in the care of patients. For the plaintiff in the case below made no showing whatever of local hospital practices with respect to patients situated similarly to himself and the evidence when viewed in the light most favorable to the plaintiff is not sufficient to raise a jury issue upon the issue of lack of common law due care on the part of the hospital.

Mr. White entered the hospital upon February 10, 1964, and his fall occurred at approximately 4:15 a. m. on February 14. There is no evidence in the record but that he appeared during this period to be alert, lucid, and capable of caring for himself. He did testify that he was "groggy" on the evening of February 13 and that during the preceding days he slept much of the time and had little interest in his surroundings. However, he also testified that as a result of his bowel obstruction it was necessary for him to relieve himself in that regard frequently and he experienced no difficulty in getting out of bed to do so. In this regard he took care of himself and upon each occasion he would signal for a nurse to come and clean out the chair placed there for his use. He received visitors, was able to recall at least who some of them were, and conversed with them, although he may have dozed in the presence of some. The evidence showed that the plaintiff was given 100 miligrams of demerol on each day up to, but not including the 13th of February. Drs. Farrar and Strain, the only experts who testified, stated that demerol is an analgesic or narcotic pain relieving drug. Dr. Farrar stated that demerol was about as mild a narcotic as was used hypodermically. On the evening of the 13th at 11:30 p. m., the plaintiff was given "phenaphen with codein 3". Both Dr. Farrar and Dr. Strain testified that phenaphen with codein was a very mild narcotic, much milder than demerol. Dr. Farrar stated that this narcotic was only slightly stronger than two or three aspirin. He further said that 100 miligrams of demerol, the dosage which plaintiff had been receiving, was two or three times stronger than phenaphen with codein. On the evening of February 13th at 9:00 p. m. the evidence showed that the plaintiff also received 1½ grains of secanol. Dr. Strain testified that this was sodium secanol, a mild sedative which wears off in three or four hours. There is no evidence that the plaintiff during these four days in which he received dosages of narcotics and barbiturates experienced any difficulty in moving about his room or in getting on and off his bed. None of the hospital employees testified that Mr. White was anything other than apparently able to care for himself. There was no evidence that he had fallen prior to the fall in which he was injured. Although a signal was by his bed and he was aware of this signal and frequently used it to summon a nurse to clean his chair, there is no evidence that he ever complained to any hospital employee concerning the effect of the drugs other than a request to Dr. Farrar that the narcotics be administered orally rather than intravenously.

The Court is unable to say that the plaintiff showed any circumstances giving rise to a special duty on the part of the hospital to take steps to prevent the plaintiff from injury through a lack of capacity to care for himself, for such

lack of capacity does not appear from the plaintiff's proof.

In addition to his theory that the hospital was negligent in failing to provide siderails or other restraints on his bed or in failing to assign him adequate nursing care, the plaintiff also alleged that the hospital maintained a hazardous condition in his room in that a rollaway table used to serve meals to bed ridden patients was left near the foot of his bed in a position in which it would be foreseeable that the plaintiff would trip over it and fall. The plaintiff himself testified that he always got out of the bed to use the commode chair on the righthand side of the bed, on which side the chair itself was located. Assuming this to be his practice, it would not have been foreseeable to the hospital that he would be walking in the area of the foot of his bed at any time and particularly during the night. Furthermore, there is no indication from the evidence that there was anything hazardous about the location of the table. The evidence shows that it was against the wall opposite the foot of the bed. It cannot be said that this was unreasonable with respect to the plaintiff for although 75 years old he appeared to those around him to be relatively alert, able to see and perceive objects around him and as able as any person to refrain from stumbling over ordinary objects such as room furniture. In addition there is no evidence that plaintiff actually fell over this table. At trial, the defendant introduced proof of statements made by plaintiff after the fall that he had fallen over the table, but plaintiff denied any knowledge of these statements and attempted to disprove them.

■ We think that the evidence relating to the allegation of maintenance of a hazardous condition was insufficient to present a question for the jury as to whether the hospital was negligent in that regard.

■ It might further be noted that the evidence as to how the fall occurred is highly speculative. The plaintiff himself remembers little or nothing about it, only that he had a sensation of falling, "a kind of midair feeling, no support of any kind." He stated at the trial that he remembered nothing, other than a vague sensation of falling, from some point in time on the evening of the 13th until the afternoon of the 14th when he was returned from surgery. He testified that he did not recall being on the floor, being helped back into the bed, or any other circumstances surrounding his fall. The registered nurse, Mrs. Grace Clifton, and the student nurse, Miss Sharon Morris, were in substantial agreement that upon hearing a noise from the vicinity of the plaintiff's room they went to his room and found him lying on the floor on the righthand side of his bed. They stated that his body was parallel to the bed, his head toward the head of the bed, and his legs, from a point about midway between knee and hip, protruding beyond the foot of the bed. The defendant in his brief states that it is immaterial whether the plaintiff fell out of the bed or fell while walking around the foot of the bed in view of the fact that the jury could have found that either had happened. With this the Court agrees. Whether he fell out of the bed or fell while walking in the room, there is no evidence of any breach of duty owed by defendant to plaintiff. The Court is of the opinion that the trial court should have directed a verdict for defendant at the close of all the proof, or, failing that, should have granted defendant's motion for judgment n. o. v.

Reversed and dismissed.