# CARL THURMER v. SOUTHERN RAILWAY CO.
## —293 S. W. (2d) 600.

Eastern Section. January 11, 1956.

Petition for Certiorari denied by Supreme Court, June 26, 1956.

356

Duncan, Duncan & McGee, Knoxville, for plaintiff in error.

Key & Lee, Knoxville, for defendant in error.

McAMIS, P. J. Carl Thurmer, an employee of defendant Southern Railway Company, brought this action under the Federal Employers' Liability Act, 45 U. S. C. A. sec. 51 et seq. to recover damages for personal injuries sustained when the plug of a "by-pass" valve on the steam line of Passenger Train 41 flew out as the plaintiff was in the act of opening the valve. The trial judge, at the close of all the evidence, directed a verdict for defendant and plaintiff appeals.

After defendant moved to strike the bill of exceptions because not marked filed by the clerk of the Circuit Court, plaintiff, on suggestion of dimunition of the record, brought up a certified copy of the rule docket of the Clerk showing that a bill of exceptions was filed in this case May 5, 1955. The bill of exceptions itself bears the imprint of a rubber stamp showing that it was filed on that date but not indicating by whom. We think the two documents fairly show that it was filed.

The bill of exceptions and exhibits therein referred to were approved by the trial judge on the same date. The exhibits, however, though marked filed by the Clerk during the trial, were not marked filed as a part of the

bill of exceptions. It was not necessary that they be refiled under Code Supp. 1950, Section 8967, Official Code Title 27, Section 104, providing:

"In suits at law removed to the Court of Appeals or Supreme Court, depositions read and exhibits introduced as evidence at the trial shall be a part of the record and need not be included in the bill of exceptions, but shall be reviewed and examined along with all other evidence."

The declaration avers that when plaintiff was in the act of opening the valve the plug which screws in the top of the valve, due to the rusty condition of the plug and the fact that the threads were stripped and worn, blew off allowing steam to envelop him and causing the injuries for which he sues; that defendant knew or by the exercise of due care should have known of the defective condition of the plug; that notwithstanding the existence of this dangerous condition and the fact that plaintiff's duties required him to open the valve, defendant "negligently permitted and caused steam to be in the stream conduits and the plaintiff avers that the steam was under a tremendous and unsafe amount of pressure".

It is to be seen that the defendant is charged with three separate acts of negligence: (1) Defective and unsafe condition of the valve and particularly of the plug, (2) excessive pressure and (3) allowing the pressure to be on while plaintiff's duties required his presence in and around the valve. The third charge of negligence as to allowing pressure to be on does not specifically relate the act to the time when plaintiff was required to be near the valve but in the taking of proof it was treated by both parties as raising that issue.

The defendant filed a plea of the general issue and it was stipulated that both parties were engaged in interstate commerce at the time of the accident, August 21, 1952. The principal defenses are that defendant was operating according to approved standards; that the pressure was not excessive and that the car on which plaintiff was working belonged to the Norfolk & Western Railway Company and, if the valve was defective, it was due to a latent defect which no reasonable test or inspection would reveal.

The railroad passenger car in question was received by defendant in Bristol, Tennessee, from N. & W. on the morning of the accident. Regulations of the Interstate Commerce Commission required that it be inspected by defendant when it was received. At Bristol it became a part of Train Number 1 which arrived at defendant's station yards in Knoxville at about 10:00 A. M. It and two other cars were there cut out of Train 1 and placed on Track 1, near the yard steam line, to await the arrival of Train 41 due to arrive from Bristol (the east) at 2 P. M. While the cars were standing on Track 1, they were given a ''running inspection'' and the steam was applied to the steam line of the cars for the purpose of noting whether there were any defects sufficient to cause the escape of steam. None was detected. The pressure at the yard plug, however, was not in excess of 70 lbs.

Train 41 arrived at the yard at about 2 P. M. and stopped on Track 2 which is parallel to Track 1 and south of it. Plaintiff's duties as a car inspector required him to inspect Train 41 beginning at the rear car and working forward. While he was thus engaged the two Diesel engines pulling Train 41 were disengaged and they and a switch engine moved forward to a point where Tracks

1 and 2 converge. They were then backed into Track 1 and coupled with the three cars cut out of Train 1. The car with the valve in question was then on the rear or eastern end of the string.

The two Diesels and the three cars then moved west beyond the point of convergence of the two lines and backed on Track 2 where they were coupled with cars of Train 41. As a safety measure and because no pressure was needed, the fireman acting on standing instructions cut the steam entirely off during this switching operation and did not cut it on again until he started backing in the final movement. He then set his gauge at 150 lbs. expecting pressure to build up while he was backing into the cars of Train 41. He testified that the last time he looked before the accident and after he had coupled with the cars the gauge stood at 90 lbs. When he saw steam escaping at the time of the accident he looked immediately and it still stood at 90. The record suggests that a break at the valve would cause the pressure to drop almost immediately at the gauge.

Plaintiff testified that after the three cars had been backed into the cars of Train 41, he went between the cars to cut the steam into the cars of Train 41 and attempted by hand to pull the lever of the valve on the N. & W. car but, because of the high pressure on the line, the lever jerked out of his hand. He then used a wrench to pull it down and when he did so the cap flew off allowing steam to escape with such volume and force that he was thrown back for a distance of 20 or 25 feet from the train. He testfiied that "there was an awful pressure" on the line and "it was just over charged, just too much steam". He admitted that he saw nothing wrong with the valve or the plug prior to the accident.

(It seems to have been returned to N. & W. while he was in the hospital. He was told later by his foreman that the threads on the plug were stripped and that it showed evidence of having been recently repaired.)

Plaintiff testified that the danger of coupling a steam line between cars can be avoided by using a dummy "glad hand" and subjecting the valve to the normal pressure of 150 lbs. or by cutting off the steam while the coupling is being made.

Since it is conceded that the steam was cut off while the three cars were being attached to eliminate the danger of coupling to the engine with the line under pressure, it is clear that defendant recognized the danger of the operation. Mr. Stiles, defendant's foreman of car inspectors, testified that it took some time to build up pressure and, because of the "time element", the pressure could not be cut off in making couplings near the time the train is about to depart. This, however, was practiced until a change of yard personnel some time in 1952 before the accident.

The proof for defendant is that, short of dismantling each valve, there is no known method of testing and inspecting valves that was not employed in testing and inspecting the valve in question. As we understand the record, however, no effort was made to see whether the cap was tight and the only tests made were to subject the valve to 70 lbs. of pressure and have an inspector walk by and look at it.

With deference to the able Circuit Judge, we think, the case should have gone to the jury. We think a jury could reasonably find that subjecting a valve to 70 lbs. pressure will not demonstrate its fitness to with-

stand 90 to 150 lbs., the latter being the normal pressure on the line while the train is in operation and the former the actual pressure at the time of the accident even accepting the evidence most favorable to defendant. The inference from plaintiff's proof is that the pressure was much greater.

The testimony for defendant is that when the pressure was applied at the plug and no steam escaped it could be assumed that there were no defects in the valve. But, something for which plaintiff was in no way responsible caused the cap to blow off. Manifestly, the cause was either defects in the valve or excessive pressure and if, as defendant's witnesses say, the absence of escaping steam indicated a valve free from defects, a jury might conclude that the cause was excessive pressure notwithstanding the fireman's testimony. If such a test would not disclose dangerous defects the jury might find that defendant was not in the exercise of due care in not subjecting the valve to an adequate test. Defendant's witness Styles admitted that 70 lbs. was not adequate pressure for testing for weaknesses that would cause an explosion at considerably higher pressure.

An employer is chargeable with knowledge of any defect which a proper inspection would have disclosed. The degree of care is measured by the circumstances of each case depending on the danger to the employee from the nature and use of the machine in question and the general rule is that general practice although proper to be considered is not always the measure of care required. See 35 Am. Jur. 572-3. Master and Servant, Sec. 141.

In Southern Railway Co. v. Derr, 6 Cir., 240 F. 73, 75, it was held for the jury to say whether there should have

been a careful and detailed inspection or whether a foreman's superficial observation was sufficient to satisfy the obligation of the master.

"Where an employer is in a position to have discovered, by the use of ordinary care, the dangerous condition of an instrumentality not belonging to him but by which his servant was injured in the performance of his duties, the question of the employer's negligence is for the jury * * *." 57 C. J. S., Master and Servant, sec. 534, p. 174.

Where an inspection is necessary, whether reasonable care has been exercised in making an inspection to determine the safety of a tool or appliance is a question for the jury, Memphis P. & L. Co. v. Telgham, 11 Tenn. App. 395, and whether a defect was latent or obvious and discoverable by the exercise of due care is generally a question for the jury. 57 C. J. S., Master and Servant, sec. 534, p. 189.

As applied to this case involving a car which had been in defendant's possession long enough to permit it to be tested in the yard under adequate pressure, we think the case should have gone to the jury on the question of defendant's negligence in not cutting off the steam while the valve was being opened as had formerly been the practice. It was for a jury to say whether avoiding a delay in departure of the train was a sufficient excuse for changing from a safe practice to one which there is evidence to indicate was not safe.

We think the testimony of the witness Heath that formerly the practice had been to cut off the steam while couplings were being made was competent as showing the feasibility of using a safer method. See Stone v.

New York C. & St. L. R. Co., 344 U. S. 407, 73 S. Ct. 358, 359, 97 L. Ed. 441, where it was said:

"Whether the straw boss, in the light of the risks should have used another or different method to remove the tie or failing to do so was culpable is the issue. To us it appears to be a debatable issue on which fair-minded men could differ."

In holding that a jury could only speculate as to whether or not the defect was latent no doubt the learned Circuit Judge was influenced by Memphis Street Ry. Co. v. Stockton, 143 Tenn. 201, 226 S. W. 187, 188, 22 A. L. R. 1467, cited in defendant's brief in this Court. In that case, however, there was no proof that a safer practice could have been followed to avoid or lessen the danger; nor was there anything from which a jury could have found that the defect was obvious or, if latent, that proper testing and inspection would have revealed its existence, for the Court observed that there was nothing in the case "tending to charge the street railway company either with actual or constructive knowledge of the defect in the brakes." The question of inspection was not involved.

Since we hold the circumstances sufficient to take the case to the jury it is unnecessary to decide whether res ipsa loquitur applies.

██ For the record, it is proper to say that we think the Court was correct in excluding as hearsay a statement about the accident attributed to defendant's foreman when he visited plaintiff in the hospital for the purpose of getting a statement as to how the accident occurred. To be admissible against the principal the declarations or admissions of the agent must relate to the act he is per-

forming for the principal at the time the declaration or admission is made. Moore v. Bettis, 30 Tenn. 67; Louisville & N. R. Co. v. Bohan, 116 Tenn. 271, 94 S. W. 84; Chattanooga Interstate Fair Ass'n v. Benton, 5 Tenn. App. 480.

██ We think defendant, in explanation of its failure to produce the valve which caused the injury, could show the extent of the inquiry and search made to locate it, as that it corresponded with the Norfolk & Western Railway about it, but that evidence of the contents of letters from Norfolk & Western would be hearsay and inadmissible.

For the reasons indicated the judgment must be reversed and the case remanded for a new trial.

Hale and Howard, JJ., concur.