WILLIAM PERKINS, Plaintiff-Appellant, v. PARK VIEW HOSPITAL, INC., and DR. GEORGE K. CARPENTER, JR., Defendants-Appellees.
—456 S.W.2d 276.

Middle Section. March 26, 1970.

Certiorari Denied by Supreme Court July 6, 1970.

460

Robert Hines, Jr., Paducah, Ky., Francis J. Steiner, Jr., Nashville, for plaintiff-appellant.

Frank C. Gorrell, Bass, Berry & Sims, Dan E. McGugin, Jr., Watkins, McGugin, Stewart, Finch & McNeilly, Nashville, for defendants-appellees.

TODD, J. The plaintiff, William Perkins, sued Park View Hospital, Inc., Dr. George Carpenter, Sr. and Dr. George Carpenter, Jr., for negligently causing death of plaintiff's wife.

At the conclusion of plaintiff's evidence, a verdict was directed in favor of Dr. George Carpenter, Sr. No appeal

is taken from this action. At the conclusion of all the evidence, a verdict was directed in favor of Park View Hospital and Dr. George Carpenter, Jr. From this latter ruling, plaintiff has perfected his appeal.

Plaintiff is a member of the Armed Forces and resides in Hopkinsville, Kentucky. His wife, Jean Parker Perkins, was afflicted with emotional and nervous problems, arthritic and back pain. After some treatment by Army physicians, she engaged Dr. Gerald H. McCord, of Hopkinsville, who continued to treat her as her personal, private physician, especially for her back pain. In October, 1966, after treatment in a Hopkinsville hospital, Mrs. Perkins was referred by Dr. McCord to Dr. George K. Carpenter, *Sr.*, who prescribed drugs, saw her a number of times and released her as improved on December 8, 1966.

On December 21, 1966, Mrs. Perkins returned to Dr. McCord who prescribed medication for her pain. On December 28, 1966, Mrs. Perkins returned to Dr. McCord with complaint of intense back pain. She received medication for pain and was sent to Dr. Carpenter *Sr.*, who had retired. Dr. Carpenter, *Jr.*, saw Mrs. Perkins on December 28, prescribed medication for pain and sent her home.

On December 29, plaintiff reported to Dr. Carpenter, *Jr.*, that his wife was in intense pain and was instructed to bring her to Park View Hospital in Nashville. She was admitted about 11:40 P.M. on December 29. At 4:00 A.M. on December 30, she expired.

There are five asignments of error. The first two complain of the directed verdicts in favor of the respective defendants. Since the last three complain of the exclusion

of evidence, they should be disposed of before reviewing the directed verdicts.

■ The third assignment of error complains of the exclusion of testimony of the plaintiff concerning his conversations with Dr. Harry G. Browne. The pertinent part of said conversation as preserved in the record is as follows:

"Q  What did you say to him?

A  I asked him what actually happened to my wife because the insurance people were wanting to find out before they did anything.

Q  What did he tell you?

A  He said she died of anaphylactic shock due to an overdose of medication.

\*  \*  \*  \*  \*  \*

A  I asked what was holding the death certificate up and he said he didn't know.

Q  What did he say to you?

A  He finally signed the death certificate and he xeroxed it or something, I don't know what it was. But He hit me like this (demonstrating) and said, 'This will get you some money.'

Q  What did he say about the cause of her death?

A  Anaphylactic shock due to an overdose of medication."

Plaintiff insisted at the trial, and insists on appeal that the above testimony of statements made by Dr. Browne to plaintiff are competent as admissions of an agent of

a party to the suit; i. e., Park View Hospital. There is no insistence that such statements of Dr. Browne are competent against the other defendant, Dr. Carpenter, Jr.

Plaintiff insists that Dr. Browne was the agent of the hospital because, after permission for autopsy was granted to the hospital, the hospital selected Dr. Browne to perform the autopsy. Plaintiff also relies upon the fact that Dr. Brown's office and laboratory is located in the basement of the hospital, and that the employees of the hospital referred plaintiff to Dr. Browne for information.

The uncontradicted evidence shows that Dr. Browne is a pathologist who is a partner with Dr. John Thomison, a pathologist, and Dr. Augri Alley, an internist; that the partnership has several offices and laboratories, including one in the basement of Park View Hospital; that the relationship of the hospital and the doctors is that of landlord and tenant; and that the hospital or patient is billed separately for each service rendered.

All of the evidence is to the effect that Dr. Browne's firm was an independent contractor in relation to the hospital. There is no evidence that Dr. Browne was such an employee or agent of Park View Hospital as would authorize him to speak for the hospital or to make any admission which would be competent evidence against the hospital.

The general rule as to admissibility of extra-judicial statements of parties to a lawsuit is stated in 31A C.J.S. Evidence sec. 272, p. 696 as follows:

"a.  In General

Any statement made by or attributable to a party to an action which constitutes an admission against his interest and tends to establish or disprove any material fact in the case is competent evidence against him."

In Thurmer v. Southern Ry. Co., 41 Tenn.App. 354, 293 S.W.2d 600 (1956), a foreman of the defendant railroad visited the injured plaintiff in the hospital for the purpose of getting a statement of how plaintiff was injured. The foreman at that time made an admission as to the cause of injury. It was held that the foreman's hearsay statement was properly excluded. This Court said:

"To be admissible against the principal the declarations or admissions of the agent must relate to the act he is performing for the principal at the time the declaration or admission is made. Moore v. Bettis, 30 Tenn. 67; Louisville & N. R. Co. v. Bohan, 116 Tenn. 271, 94 S.W. 84; Chattanooga Interstate Fair Ass'n v. Benton, 5 Tenn.App. 480." 41 Tenn.App. pp. 363, 364, 293 S.W.2d, p. 604

In 31A C.J.S. Evidence sec. 344, pp. 841, 842 is found the following:

"Unless the agency is already apparent or is expressly or impliedly admitted, or unless the statement has been ratified, the party seeking to introduce the admission must establish the relation of agency between the declarant and the person against whom it is sought to use his admission, and the fact that the admission was made while declarant was acting within the scope of his authority."

Also on page 847 of the same article is found the following:

"The relation of principal and agent must exist at the time the statement is made in order to permit its introduction into evidence as an admission.

"An admission made before declarant was employed as the agent of the party against whom it is sought to be used or after such employment had terminated cannot be received."

There is no evidence that the hospital authorized Dr. Browne to form and express an opinion as an admission against the hospital.

Plaintiff cites Sepaugh v. Methodist Hospital, 30 Tenn. App. 25, 202 S.W.2d 985 (1947), however that case involved a paper which was admittedly a part of the records of the hospital, and did not involve an admission of an alleged agent. Plaintiff also cites Argonaut Southwest Insurance Co. v. Morris, Tex.Civ.App., 420 S.W.2d 760 (1967), however in that case, the unsworn statements were made to plaintiff by doctors during an examination of plaintiff by said doctors who had been specifically selected and employed by defendant to make such examination, and the court found such statements to be made by agents while performing their duties as such.

Plaintiff cites Wigmore on Evidence, Third Edition, sec. 1078, which contains the following:

"(1) He who sets another person to do an act in his stead as *agent* is chargeable in substantive law by such acts as are done under that authority; so too, properly enough, admissions made by the agent in the course of exercising that authority have the same

testimonial value to discredit the party's present claim as if stated by the party himself.

"The question therefore turns upon the scope of the authority. This question, frequently enough a difficult one, depends upon the doctrine of Agency applied to the circumstances of the case, and not upon any rule of evidence. * * *'' Wigmore on Evidence, p. 119

The only Tennessee cases cited under the foregoing article are Frank v. Wright, 140 Tenn. 535, 205 S.W. 434 (1918), and Hudson v. Philadelphia Life Ins. Co., 152 Tenn. 691, 280 S.W. 403 (1926), in both of which the statements and acts of the alleged agent were held to be unauthorized and not provable against principal.

Plaintiff cites generally 29 Am.Jur.2d, Evidence, sec. 667, which deals with statements of officers and agents of corporations. Said section does contain the following generalizations:

"The question whether the statement of a corporate officer or agent is evidence against the corporation *depends upon whether he was authorized by the corporation to make the statement* and whether he made it in his official capacity as an officer or agent, and does not otherwise depend upon his title or position. If he is authorized to make a statement and makes it pursuant to such authority in the course of the business entrusted to his management, such statement is admissible in evidence against the corporation regardless of the title of his office or position. * * *'' 29 Am.Jur. 2d, Evidence, p. 720 (emphasis supplied)

"On the other hand, the admissions or declarations of lesser officers or employees of corporations are not

admissible against the corporation *where they are not authorized to speak for the corporation* and do not make such statements while acting for the coproration.'' 29 Am.Jur.2d, p. 722 (emphasis supplied )

In Quaker Oats Co. v. Davis, 33 Tenn.App. 373, 232 S.W.2d 282 (1949) a report made by a laboratory was held competent under the facts of that case. In view of the authorities heretofore cited and quoted, such a ruling would not be justified under the circumstances of the present case. This is especially true because Dr. Browne was present and testified in this case and plaintiff had the opportunity to examine him on the subject. Furthermore, the evidence of Dr. Browne's finding was otherwise presented to the jury.

██ There is another reason why the exclusion of Dr. Browne's extra-judicial statements was not reversible error. Even if the jury should conclude that the death of Mrs. Perkins was the result of an overdose of drugs, this fact alone would not justify a recovery. An overdose of drugs may or may not be due to the negligence of the doctor or hospital. An overdose may be simpy more than the particular person could tolerate and therefore not subject to anticipation in reasonable caution and care. There being no evidence of negligence on the part of the doctor or hospital, the exclusion of evidence of overdose is harmless. T.C.A. sec. 27-117.

The third assignment of error is respectfully overruled.

██ The fourth assignment of error is as follows:

''The court erred in excluding the testimony on cross examination of Dr. Burd relating to the cross reaction

of soma and meprobamate and the use of the related article.''

The burden of the cross examination was an effort by plaintiff to induce the witness to accept as valid certain statements made in an article published in the American Medical Association Journal. This, the witness steadfastly declined to do. The article, itself, explains in the first paragraph thereof that its purpose is:

"* * * to report the first case of fixed drug eruption from carisoprodol, and the first incidence of cross reaction between this drug and meprobamate.''

The experience reported in the article involved an adverse skin reaction from use of the drug carisoprodol, after which the drug was discontinued and meprobamate was administered with the same skin reaction. The only inference to be drawn from this article is that if a patient displays an allergy to carisoprodol, then the same patient would probably also display an allergy to meprobamate.

The said magazine article does not purport to be an authoritative pronouncement upon any scientific fact at issue in this cause. The witness, Dr. Burd, testified without contradiction that the said magazine was not an authoritative treatise, but rather a medium for dissemination of individual opinions of individual authors. The said article, and line of cross examination was properly excluded.

The fourth assignment of error is respectfully overruled.

The fifth assignment of error is as follows:

"The court erred in excluding during plaintiff's proof exhibits 8, 9, 10 (certified prescriptions) and 14 (autopsy report)"

Although exhibits 8, 9, and 10 were initially excluded, the following occurred during the testimony of Dr. Burd (B.E. 175, 176):

"MR. STEINER: Your Honor. I don't know whether these exhibits they refer to, Exhibit Eight, Nine, and Ten—they had the witness testify about these exhibits and I am offering those in evidence now.

THE COURT: Let them be admitted.

(Whereupon, the three certified documents previously marked Plaintiff's Exhibit Eight, Exhibit Nine, and Exhibit Ten, for identification were received into evidence.)"

During the testimony of Dr. Browne (B.E. 285) the following occurred:

"Q   I hand you this document, the autopsy protocol. Is that the autopsy report you prepared?

A   Yes, it is.

Q   It is?

A   Yeah.

Q   You might want to look at it, Doctor, to make sure that is your autopsy report. That is your report, isn't it, Doctor?

A   Yes, sir.

MR. STEINER: I would offer this as Exhibit Fourteen.

(Whereupon, a document was marked plaintiff's Exhibit Fourteen and received into evidence.)''

Thus it conclusively appears from the record that the exhibits referred to in the fifth assignment were not excluded, but were admitted into evidence.

The fifth assignment of error is respectfully overruled.

The first assignment of error complains of the direction of verdict in favor of defendant, Park View Hospital.

The declaration alleges that plaintiff's wife died of ''anaphylactic shock caused by excessive medication,'' and charges the defendant hospital with the following negligent acts or omissions:

1. Administration of excessive medication.

2. Failure to supervise and watch after the health of deceased.

3. Failure to determine condition of deceased on admission.

4. Failure to ascertain that deceased had received and was being affected by excessive medication.

5. Failure to take proper action to save the life of deceased.

The special pleas of the defendant hospital deny each of said acts or omissions.

Plaintiff argues, correctly, that there is evidence from which the jury might find that the death of Mrs. Perkins was due to anaphylactic shock resulting from excessive medication taken for back pain. As previously stated herein, such fact, standing alone is insufficient to sustain liability for negligence. In respect to the defend-

ant, Park View Hospital, there must be evidence that the medication which produced death was *negligently* administered by an employee or employees of the hospital. This necessary element is not sustained by the evidence.

The uncontradicted evidence from the testimony and hospital records is to the effect that the deceased was admitted at 11:40 P.M. on December 29; that at 11:45 she was administered 400 milligrams of Meprobamate; that at 11:45 she was administered $\frac{1}{32}$ grain of Dilaudid; that both medications were upon orders of her physician; and that she received no other medication during her stay in the hospital. There is no evidence that the employees of the hospital were negligent in respect to the medication administered by them. This disposes of allegation of negligence numbered (1), supra.

The allegation of failure to supervise and watch the patient is likewise unsupported by the evidence. The unimpeached testimony of the registered nurse in charge of the area is as follows:

"Q After you had given her the medicine as per the Doctor's orders, what did Mrs. Perkins do then?

A She went to sleep in about 20 or 30 minutes. She was checked on real frequently, she was comfortable and asleep. We were in and out of the room at least every 30 minutes, probably more often.

\* \* \* \* \* \*

Q During this period of time when you and the other nurses were checking on her, was there ever any evidence of anything unusual? What was her condition during that period of time?

A   She appeared to be all right. We checked her. I went in several times. She was sleeping and I didn't awaken her, but I checked her pulse and it seemed to be normal and strong and there was no evidence that anything was going wrong.

Q   Mrs. Holeman, do you or the other nurses or the Practical Nurses or the technicians make an entry on the chart every time you look at a patient?

A   No, sir, this would be impossible.

*     *     *     *     *     *

Q   Now, Mrs. Holeman, what was the first notice that you had that there was anything unusual occurring?

A   Four o'clock.

Q   And just tell us what notice did you receive?

A   Well, the nurse technician on the floor began her rounds and this was the closest room to the nurse's station. This is where she began. She started at 4:00 o'clock and got to this room and she said Mrs. Perkins didn't look right. I immediately went to the room, flipped on the light, and she didn't seem to be breathing. I felt her pulse and I didn't find it. We started resuscitation right away.''

On the hospital record, there is only one entry between 12:00 midnight and 4:00 A.M., and the time of such entry is illegible. However, the above quoted and uncontradicted testimony cannot be impeached by the mere fact that every detail thereof is not recorded. Furthermore, there is no evidence in this record to indicate how often the nursing staff of a hospital should observe a patient

under the standards of procedure generally followed in the area by reputable hospitals.

There is therefore no evidence in this record to sustain a finding of negligence under charge (2) supra.

The charge (3), that the hospital employees failed to ascertain Mrs. Perkins' condition on admission, is likewise unsupported by the evidence. The uncontradicted testimony, and the records of the hospital, show that all usual tests and observations were made and recorded. Plaintiff insists that the occurrence of death at 4:00 A.M. creates an inference that some condition could and should have been observed 4⅓ hours previously at 11:40 P.M. which would have forewarned of impending death. Such an inference cannot be drawn by laymen from the ordinary experiences of life, and is specifically contradicted by the medical evidence in the record.

Plaintiff's charge numbered (4) is predicated upon the premise that the employees of the hospital were under a duty to ascertain by some means exactly what medication had been administered to or taken by the deceased for some unspecified period prior to her admission, and to ascertain how and to what degree she was, had been, or was being affected by such medication. Neither in the brief of plaintiff, nor elsewhere in the record is there any enlightenment upon the professional standard of care in this respect, as established in the community. The admitting nurse did ask deceased when she last had medication (more than four hours previous) and did observe her condition of alertness and "vital signs." Just how a hospital might ascertain the proposed information, other than by the standard means which were used, is not disclosed.

Plaintiff relies heavily upon the record notation and testimony of the nurse that deceased was "groggy," upon admission. Plaintiff insists that "groggy," means in a semi-comatose condition. The nurse who made the entry testified that she used "groggy" in its meaning of "unsteady" on the feet, and that this referred to difficulty in walking and standing because of intense back pain. No judicial definition of the word "groggy" has been found. Webster's Third International Dictionary, Unabridged, defines "groggy" as follows:

> "*groggy, adj 1* intoxicated, drunk *2a* of a horse weakened (as from age, overwork, or disease) in the fetlock joints and entire forelegs so as to have a hobbling gait marked by the knuckling over of the fetlock joints *b* of a boxer: weakened from fighting and especially from blows on the head so as to be unsteady on the feet or to stagger and to have an impaired consciousness *3*: weak, sleepy, exhausted, ill or otherwise physically affected in such a way as to be sluggish in one's reactions, dazed, muddled *4* tending to wear away (pumice and other soft materials) or crumble [a——————— tooth] or collapse [a——————— old wooden tower]"

■ Where a word has been used with intent that it convey a recognized meaning, then the meaning intended by the user must be accepted; and some other unintended meaning may not be inferred and imposed upon the user merely because it is also a recognized definition. There is no evidence to indicate that the patient's grogginess was other than described by the nurse, and other unintended meanings of the word "groggy" cannot supply the lack of evidence.

The evidence does not support plaintiff's charge numbered (4).

Plaintiff's final charge (5) in the declaration presupposes that the death of Mrs. Perkins was preceded by such manifestations as were or should have been observed and acted upon by hospital employees. The matter of watchfulness has been previously considered. There is no evidence that such warning signals did exist, or might reasonably have been expected to exist under the circumstances. On the contrary, the uncontradicted expert medical evidence is to the effect that anaphylactic shock can, and often does, strike suddenly without previous symptom or warning.

There is no evidence that the employees of the hospital were in any degree negligent in failing to observe the approaching demise of Mrs. Perkins or in failing to take proper steps to save her life. The declaration does not charge, but plaintiff's brief insists that the hospital was negligent in failing to report "grogginess" to the doctor. He testified that such a report, if made, would not have changed his orders.

Plaintiff cites Sepaugh v. Methodist Hospital, 30 Tenn. App. 25, 202 S.W.2d 985 (1946) wherein there was testimony of a physician that if the solution and equipment had been free of contamination, the injury would not have occurred. There is no corresponding expert medical evidence in the present case.

Plaintiff also cites Crowe v. Provost, 52 Tenn.App. 397, 374 S.W.2d 645 (1963) which was an action against a doctor and his employee, a nurse. There was evidence that the nurse did not follow accepted and proper nursing practice in attending the child, and this Court said:

"[7] Accordingly, we are of the opinion the medical proof in the record that some condition for which defendants would not be liable because not due to any act of negligence on their part might have caused the death of the child does not destroy or overcome as a matter of law the probative force of the evidence that the more probable cause was the negligence of the defendant nurse in abandoning an ill and unconscious child." 52 Tenn.App., pp. 411, 412, 374 S.W.2d, p. 651

Thus in Crowe v. Provost there was affirmative evidence of negligence of the nurse, for which she and her employer might be held liable. There is no such evidence in the present case.

Plaintiff cites Davis v. Memorial Hospital, 58 Cal.2d 815, 26 Cal.Rptr. 633, 376 P. 2d 561 (1962), which involved alleged injury from negligent administration of an enema, and it was held that it is a matter of common knowledge that enemas are not ordinarily harmful unless negligently administered. It can hardly be said that it is a matter of common knowledge that patients do not die in hospitals if they are properly cared for.

Plaintiff cites Thompson v. Thomas, 12 Tenn.App. 484 (1930), as authority for taking judicial knowledge of the effects of various drugs. It is apparent that the statements in said opinion are a summary of scientific facts in evidence, rather than of lay knowledge of the subject.

Johnson v. Ely, 30 Tenn.App. 294, 205 S.W.2d 759 (1947), cited by plaintiff, is based upon the inference of negligence from proof of the fact that a needle was left inside a body during surgery, and the inference that a needle later found in the body may, might, or must have

been left in the body during surgery. No such compelling circumstances exist in the present case.

In Spivey v. St. Thomas Hospital, 31 Tenn.App. 12, 211 S.W.2d 450 (1947), cited by plaintiff, the patient was in delirium on admission and was not properly restrained. The case is not in point. "Groggy" does not mean "in delirium."

■ In Poor Sisters of St. Francis v. Long, 190 Tenn. 434, 230 S.W.2d 659 (1950), cited by plaintiff, the patient suffered severe bodily injuries, including fractured vertebra and left arm, while in the care of the hospital. Since the common experience of man is that a patient does not ordinarily receive a broken arm and back during childbirth and hospital convalescence, the circumstances were held to present a case of "res ipsa loquitur." The present case does not fall within such well known and ordinary experience of man as to justify the application of the doctrine of res ipsa loquitur.

Plaintiff urges that there has been a "conspiracy of silence" among the medical profession in the present case, and that such silence requires a liberal use of inferences to supply the information withheld. There is no evidence of a "conspiracy of silence" in the present case. On the contrary, the medical witnesses have testified with apparent candor, but have been unwilling to assent to suppositions, assumptions, and theorizations not justified by their training and experience. The malady which is alleged to have taken the life of Mrs. Perkins is shown to be elusive in the extreme. Its causes and manner of progression are shown to be varied and unpredictable. Authoritative scientific data regarding the malady is extremely limited. It is not surprising, therefore, that the

medical profession should be guarded in their statements on the subject.

The application of the doctrine of res ipsa loquitur is based upon general familiarity with the subject matter, rather than unfamiliarity. In this respect, the present case is readily distinguishable from the cited authorities where the doctrine was applied.

A review of all the evidence and applicable authorities supports the ruling of the trial judge in favor of the defendant hospital.

The first assignment of error is respectfully overruled.

The second assignment of error complains of the directed verdict in favor of the defendant, Dr. George K. Carpenter, Jr.

As previously stated, the declaration declares that plaintiff's wife died "of anaphylactic shock caused by excessive medication." The declaration further charges the defendant Carpenter with the following negligent acts or omissions:

1. Failure to treat deceased properly.

2. Use of medication to cover instead of cure the injury of deceased.

3. Failure to hospitalize deceased on a prior date.

4. Prescribing and giving deceased excessive medication.

5. Failure to supervise and watch after the health of deceased in the hospital.

6. Failure to ascertain that deceased had received and was being affected by excessive medication.

7. Failure to take proper action to save the life of deceased.

The special pleas of the defendant, Dr. Carpenter, Jr., deny each of said acts or omissions.

There is evidence from which the jury might have properly found that the death of deceased was due to anaphylactic shock due to her medication, but this finding alone would not justify a verdict against Dr. Carpenter, Jr. There must also be evidence of some negligence of his part which proximately caused the anaphylactic shock or death. Such negligence must be found among the above listed acts or omissions and must be supported by some material and relevant evidence.

The first charge of failure to treat properly is general, and unsupported by any evidence that the treatment was generally negligent.

The second charge is likewise unsupported by the evidence. All of the testimony indicates that the proper and accepted mode of treating back pain is by medication to relieve pain in anticipation that the cause of pain will be corrected by the body itself. A predominant portion of such cases are shown to result in recovery without other, more radical treatment. No negligence is shown in this mode of treatment.

The third charge of failure to hospitalize earlier is evidently based upon the fact that Dr. Carpenter, Jr., saw deceased for the first time on December 28, at which time plaintiff testified that he said to the defendant: "Doctor, please put this girl in the hospital", to which defendant replied that she did not need to go to a hospital. It should be noted that this occurred on the day preceding her admission to the hospital on December 29.

There is no evidence to show that the professional decision to delay hospitalization was negligent or out of keeping with accepted procedure and practice in the profession. Furthermore, there is no evidence that earlier hospitalization would have prevented the tragic and sudden demise of deceased.

The fourth, and most seriously urged charge against Dr. Carpenter, Jr., is that he prescribed excessive medication for deceased. The medication prescribed and administered after admission to the hospital consisted of one tablet (400 milligrams) of Meprobamate and one injection ($\frac{1}{32}$ grain) of Dilaudin. There is no evidence that either of these prescribed medications was excessive. Plaintiff's insistence of excessive medication is based upon the whole schedule of prescriptions issued by Dr. McCord, Dr. Carpenter, Sr., and the defendant, Dr. Carpenter, Jr. This insistence generally follows two theories.

The first theory of over-prescription relates to sodium salicylate (aspirin) or kindred compounds. It is shown that, at various times, deceased received prescriptions containing varying amounts of salicylates, but there is no evidence that at any time she was advised to take more than a safe dosage thereof. On December 28, when Dr. Carpenter, Jr., saw deceased and sent her home, he prescribed "Soma", which contains no salicylates, and Phenaphen which contains a minor amount of salicylate in combination with other drugs. This is the only salicylate prescribed at any time by Dr. Carpenter, Jr., and there is no evidence that its administration was unsafe or improper. It is insisted that defendant failed to make adequate inquiry as to medication previously taken by deceased. Even if this be true, there is no evidence that

the full and complete facts would have produced a different prescription in the exercise of ordinary skill and prudence in this branch of the science of medicine. In short, even if the death of Mrs. Perkins did result from the ingestion of more salicylate than her body could tolerate, there is no evidence to show that a reasonably skilled physician could have and should have detected her unusually low tolerance to salicylate and as a result avoid the administration of salicylate.

The other theory of overdose of drugs rests upon the fact that "Soma", prescribed by defendant on December 28, and "Meprobamate", prescribed on admission to the hospital, are substantially identical, and that there is some evidence of confusion by defendant as to which of the drugs had been or was prescribed and administered to deceased. There is no evidence that the two drugs were administered simultaneously on the direction of defendant in such aggregate amount as would exceed the accepted safe maximum for a normal individual.

Plaintiff insists that there is some insidious interaction between "Soma" and "Meprobamate" such that administration of one following the other will produce startling effects. There is no evidence to support such a theory. The evidence is to the contrary, that is, that the two drugs are and may be safely used interchangeably.

■■■■■■ Where the physician has exercised his professional discretion within the bounds of that which is generally regarded as good practice by experts in the field, there is no basis in law or fact for allowing a jury of laymen to "second guess" the selection and dosage of medication. It is easy to criticize professional judgment after the results have ensued. Evaluation of professional

judgment must be based upon the facts available to the professional and the accepted practice among the members of the profession under such facts.

There is no evidence that defendant Carpenter negligently prescribed excessive medication.

The fifth charge, supra, is evidently based upon the fact that Dr. Carpenter did not come to the hospital immediately upon the arrival of deceased and assume personal charge of her care. There is no evidence that careful medical procedure, as practiced in the vicinity, would have required any such action on the part of the defendant. Upon reception of his patient, the hospital notified the defendant doctor of the apparent condition of the patient, and the doctor gave directions for medication and care. The ailment for which the patient was admitted was chronic, rather than critical. There is no evidence that the course of the patient's condition or treatment would have been otherwise, or that her sudden demise would have been prevented by the presence of the defendant doctor at the hospital on the night of her arrival.

The evidence does not support the fifth charge.

The sixth charge against the defendant doctor is that he failed to perceive that the patient had received excessive medication and was being affected thereby. There is no evidence that the patient had received medication in excess of normal or usually safe dosage. There is some evidence that defendant prescribed Meprobamate because he recalled that this drug had been previously prescribed by him, when in reality the previous prescription had been for "Soma", however said drugs are shown to be almost identical and there is no evidence that this inadvertence resulted in a total dosage which was excessive

under prevailing medical knowledge and practice. Thus, if there were any failure to ascertain and realize fully the entire details of medication previously prescribed for the patient, there is no showing that the ascertainment of such details should have resulted in treatment other than that which was employed by defendant.

There is likewise no satisfactory evidence that the patient exhibited symptoms of overdosage. Plaintiff's sole ground for this contention is that the patient appeared to be "groggy" upon admission to the hospital. This particular symptom was not reported to the defendant doctor, but, as previously discussed, the "groggy" condition was unsteadiness on feet associated with pain in back. The evidence shows that the patient was alert and responsive, just unsteady on her feet and suffering from pain. Her "vital signs" as observed by the hospital employees and reported to defendant doctor, were normal. This, according to the uncontradicted medical testimony, negatives any suspicion of "shock" or warning of the subsequent attack of anaphylactic shock.

The evidence does not support charge No. 6, supra.

The seventh charge is failure to take proper action to save the life of deceased. Other than the actions and omissions otherwise specifically charged, there is no showing in the evidence or argument in brief as to how, in the exercise of ordinary medical skill and care the defendant could and should have saved the life of deceased. Defendant was not present at the hospital when the emergency was discovered, nor was he notified until after the patient had expired. He therefore had no opportunity to take any action to save the life of deceased. The

seventh, and final, charge is therefore unsupported by evidence.

The trial judge correctly directed a verdict in favor of the defendant, Dr. George K. Carpenter, Jr. The second assignment of error is respectfully overruled.

Each ground of plaintiff's suit against each of the defendants and each assignment of error has been carefully examined and found to be without merit.

Viewed as a whole, plaintiff's case represents a situation in which a patient was treated in the manner and by the means which are accepted and regarded as careful and skillful medical procedure by those who are trained in such matters. There is nothing in the facts of the case upon which a layman would be justified in finding negligence, and there is no expert testimony of negligence.

■■■ Neither surgeon nor hospital is an insurer of the patient, but each is liable only for negligence. French v. Fischer, 50 Tenn.App. 587, 362 S.W.2d 926 (1962).

■■■ The duty of a hospital is to exercise that degree of care, skill and diligence used by hospitals generally in the community and required by the express or implied contract. Thompson v. Methodist Hospital, 211 Tenn. 650, 367 S.W.2d 134 (1962). If such duty has been performed, the hospital has not been negligent.

■■■ The duty of a physician is to use his best judgment in the treatment of his patient. Wooten v. Curry, 50 Tenn.App. 549, 362 S.W.2d 820 (1961). He is required to possess and exercise the degree of skill and learning ordinarily possessed and exercised under similar circumstances by members of his profession and to use ordinary and reasonable care and diligence and his best judgment

in the application of his skill to the case. If this duty has been performed, the physician has not been negligent. 70 C.J.S. Physicians and Surgeons sec. 41, p. 946.

No breach of the foregoing duties has been shown by the evidence in this cause; hence the sudden and tragic demise of Mrs. Perkins must be accepted as an event which could not have been reasonably anticipated and prevented in the present state of medical science, and which is therefore not grounds for damages under the circumstances.

The directed verdicts and judgments in favor of the defendants, Park View Hospital and Dr. George K. Carpenter, Jr., are affirmed. The costs of this appeal are taxed against the plaintiff-appellant.

Affirmed.

Shriver, P. J. (M.S.), and Puryear, J., concur.