Boyce E. CHUMBLER, Plaintiff-
Appellant,

v.

Marguerite Wallace McCLURE, Execu-
trix of the Estate of Dr. C. C. McClure,
Jr., and Ayerst Laboratories, Defend-
ants-Appellees.

No. 74–1169.

United States Court of Appeals,
Sixth Circuit.

Oct. 23, 1974.

Franklin D. Brabson, W. Gary Black-burn, Malcolm L. McCune, Blackburn & McCune, Nashville, Tenn., Joseph W. Bolin, Clinton, Ky., for plaintiff-appellant.

W. A. Moody, Carrol D. Kilgore, William J. Harbison, Nashville, Tenn., for defendants-appellees.

Before PHILLIPS, Chief Judge, Mc-CREE, Circuit Judge, and RUBIN *, District Judge.

## OPINION

CARL B. RUBIN, District Judge.

This matter comes before the Court as a diversity case alleging medical malpractice against Marguerite Wallace Mc-Clure, Executrix of the Estate of Doctor C. C. McClure, Jr., and product liability against Ayerst Laboratories, Inc. The trial was to a jury and the trial judge directed a verdict in favor of defendant Ayerst at the conclusion of the plaintiff's case and directed a verdict in favor of the defendant Estate of Dr. C. C. McClure, Jr. at the conclusion of all evidence. We affirm.

The factual background of this case indicates that in April, 1971, the plaintiff consulted Dr. C. C. McClure, a neurosurgeon in Nashville, Tennessee, in connection with injuries sustained by Chumbler in an electrical explosion. Dr. McClure diagnosed Chumbler's illness as cerebral vascular insufficiency and prescribed a female hormone known as Estrogen, produced and marketed commercially as Premarin by defendant Ayerst Laboratories. Dr. McClure also prescribed Pavabid, a drug which dilates blood vessels. Known side effects of Premarin include an enlargement of the breasts and a loss of libido. While plaintiff also sought damages for impotence and menopausal symptoms, that issue need not be reached.

Plaintiff's appeal raises issues of whether the District Court acted properly in directing verdicts for the defendants on whether Dr. McClure violated the accepted medical standards in his com-

* Honorable Carl B. Rubin, United States District Judge for the Southern District of Ohio, sitting by designation.

munity in his treatment of Chumbler and whether defendant Ayerst acted negligently in the production or sale of Premarin. Further, the plaintiff-appellant asserts that the District Court erred in excluding all testimony on the issue of plaintiff's informed consent to his drug treatments.

■■■ The law is well settled in this circuit and elsewhere that in a diversity case, the trial judge is bound by state law as to the sufficiency of evidence. Moskowitz v. Peariso, 458 F.2d 240 (6th Cir. 1972); Thompson v. Illinois Central Railroad Company, 423 F.2d 1257 (6th Cir. 1970); Dean v. Southern Railway Co., 327 F.2d 757 (6th Cir. 1964). This Court, in Wallace v. Louisville & N. R. Co., 332 F.2d 97 (6th Cir. 1964), found that the rule in Tennessee required the court:

> "to look to all the evidence, to take as true the evidence for the plaintiff, to discard all countervailing evidence, to take the strongest legitimate view of the evidence for the plaintiff, to allow all reasonable inferences from it in his favor; and if then there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion for a directed verdict must be denied." Poe v. Atlantic Coast Line Railroad Co., 205 Tenn. 276, 284, 326 S.W.2d 461, 464 (1958); Baggett v. Louisville & Nashville Railroad Co., [51 Tenn.App. 175] 365 S.W.2d 902, 904–905 (1960).

*Accord,* Osborne v. Frazor, 58 Tenn. App. 15, 425 S.W.2d 768, 774 (1968); Goings v. Aetna Cas. & Sur. Co., 491 S.W.2d 847 (Tenn.App.1972). The rule remains the same in Tennessee today and has recently been summarized in other terms. *See, e. g.,* Phelps v. Magnovox Co., 497 S.W.2d 898 (Tenn.App.1972) (no evidence in the entire record from which a jury could have based a verdict for

the plaintiff); Keller v. East Tennessee Prod. Credit Ass'n., 501 S.W.2d 810 (Tenn.App.1973) (where a reasonable mind could only draw one conclusion from the evidence).

■■■ Against this standard, we find that the trial court did not err in directing a verdict for defendant Ayerst Laboratories. Plaintiff failed to prove participation of Ayerst in any alleged experiments by Dr. McClure, any over-promotion, or a lack of warning concerning side effects of Premarin. From the evidence adduced at trial, we find that taking the strongest legitimate view of the evidence for the plaintiff and resolving all inferences in his favor, reasonable minds could only have found in favor of defendant Ayerst Laboratories. Based upon the foregoing conclusion, we find that the District Court acted properly in directing a verdict for defendant Ayerst.

We reach the same conclusion concerning the directed verdict for the Estate of Dr. McClure. Since Dr. McClure was deceased, the plaintiff was confronted with the Tennessee Dead Man's Statute, Tenn.Code Ann. § 24–105 [1], see Worthington Corp. v. Lease Management, Inc., 352 F.2d 24 (6th Cir. 1965), cert. den. 383 U.S. 937, 86 S.Ct. 1068, 15 L.Ed.2d 854 (1967). Its applicability to tort cases in Tennessee is well established. *See, e. g.,* Christofiel v. Johnson, 40 Tenn.App. 197, 290 S.W.2d 215 (1956) While the general approach is to construe narrowly the exclusion of testimony, McDonald v. Allen, 67 Tenn. 446 (1874); Christofiel v. Johnson, *supra,* "transactions" encompass a large range of excludable testimony on things done in the deceased's presence to which he might testify from his own personal knowledge. Waggoner v. Dorris, 17 Tenn.App. 420, 68 S.W.2d 142 (1933).

■■■ We hold that the trial court did not err in excluding all testimony on

---

1. § 24–105 states, in pertinent part:
   In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify by the opposite party . . . .

**492**

the alleged lack of informed consent by the plaintiff-appellant concerning his drug treatment. Such testimony would inevitably relate to conversations with the deceased doctor or to transactions involving that doctor. The testimony which plaintiff sought to proffer as to his state of mind as it bore on informed consent also falls well within the bounds of proscribed testimony and well outside the "independent facts" exception to the Dead Man's Statute.

■ Plaintiff asserted that proof of his informed consent is an affirmative defense and, consequently, that the burden lies upon the defendant. The trial court properly found that the burden rested on the plaintiff. Since consent does not ordinarily relieve a physician from liability where he has not conformed to accepted medical standards for treatment and since the party offering testimony barred by the Dead Man's Statute has the burden of proving competency, we believe the trial judge was correct. Martin v. Morris, 163 Tenn. 186, 42 S.W.2d 207 (1931); Meadows v. Patterson, 21 Tenn.App. 283, 109 S.W.2d 417 (Tenn.Sup.Ct.1937); Story v. Saunders, 27 Tenn. 663 (1848). The harshness of this statute may be as severe as plaintiff argues in effectively making it impossible to obtain a judgment against any deceased doctor. While not deciding this issue, this Court must point out that relief lies not with the courts but with the Legislature of the State of Tennessee.

■ As the trial court properly refused to admit testimony barred by the Dead Man's Statute, we may now consider plaintiff's third ground for appeal—that a directed verdict in favor of the doctor's estate was erroneous. Deviation from accepted medical practices and community standards is a prerequisite for maintenance of a medical malpractice suit. Campbell v. Oliva, 424 F.2d 1244 (6th Cir. 1970); Perkins v. Park View Hospital, Inc., 61 Tenn.App.

458, 456 S.W.2d 277 (1970); Ison v. McFall, 55 Tenn.App. 326, 400 S.W.2d 243 (1964); Wooten v. Curry, 50 Tenn. App. 549, 362 S.W.2d 820 (1961); Beech v. Hunter, 14 Tenn.App. 88 (1931).

■ The record in this case[2] is devoid of evidence of such deviation. The most favorable interpretation that may be placed on the testimony adduced at trial below is that there is a division of opinion in the medical profession regarding the use of Premarin in the treatment of cerebral vascular insufficiency, and that Dr. McClure was alone among neurosurgeons in Nashville in using such therapy. The test for malpractice and for community standards is not to be determined solely by a plebiscite. Where two or more schools of thought exist among competent members of the medical profession concerning proper medical treatment for a given ailment, each of which is supported by responsible medical authority, it is not malpractice to be among the minority in a given city who follow one of the accepted schools. Gresham v. Ford, 192 Tenn. 310, 241 S.W.2d 408 (1951); Perkins v. Park View Hosp. Inc., supra; Ison v. McFall, supra; Ball v. Mallinkrodt Chem. Works, 53 Tenn. App. 218, 381 S.W.2d 563 (1964); Wooten v. Curry, supra.

■ Were this not true, an anomaly might occur where nine neurosurgeons in Memphis, Tennessee, prescribed Premarin for cerebral vascular insufficiency and where nine neurosurgeons in Nashville prescribed other treatment. Should one Memphis neurosurgeon move to Nashville and continue to prescribe Premarin, he might be liable for malpractice. Such a result would impose a standard of practice upon the medical profession which would be totally unsupported by logic and unreasonable in concept. See the cases cited, supra.

Scrutiny of the testimony below leads to no other conclusion. The doctors who testified asserted only that Dr. McClure was alone in Nashville among neurosur-

2. See attached Appendix for the salient testimony relating to medical standards in Nashville and elsewhere.

geons in prescribing Premarin. Accompanying testimony as to the medical acceptability of this practice and of the drug itself leave no other possible outcome other than plaintiff's failure to present even a prima facie case of malpractice. Under Tennessee law on directed verdicts, we find that the trial court acted properly in directing a verdict for the doctor's estate at the close of all the evidence. Accordingly, for this and reasons mentioned before, the actions of the trial court, both as to defendant Estate of Dr. C. C. McClure, Jr. and defendant Ayerst Laboratories, Inc. are hereby affirmed.

## APPENDIX

**Testimony of Dr. Ray W. Hester, p. 78:**

Q. Do you of your knowledge know of anyone in this community that's a neurosurgeon or a neurologist that prescribes Premarin in the treatment of cerebral vascular insufficiency other than Dr. McClure?

A. Well, Dr. McClure did, and of my own personal knowledge, I don't know of any of the other neurosurgeons who do, No, sir.

**Page 91:**

Q. Now, based on that, and based on your knowledge and based on reasonable medical certainty, etc. should that drug [Premarin] have been used on Boyce Chumbler for anything other than prostatic carcinoma?

A. Again, that's a difficult question to answer. First of all, we have just quoted two articles that one is for and the other is against. Now there are other articles in the literature where the drug has been used and has been tried and they also have conflicting evidence.

BY THE COURT: Are you saying there is a split of opinion in the medical profession as to whether or not this drug should or should not be used for a vascular insufficiency or vascular accident?

A. Yes, sir. At least at one time there was and I think the physician must come to his own conclusion from what, you know, has been read and his medical knowledge at the time . . .

**Page 98:**

Q. . . . As I understand and you correct me if I am wrong, there are two schools of thought in medicine as to the use of Premarin in the treatment of a possible vascular situation?

A. Yes, sir.

Q. All right. One school of thought promotes and uses Premarin, another school of thought to which you belong does not believe in the use of Premarin?

A. That's correct.

**Page 104:**

Q. Now, as you are a neurosurgeon and as you do meet with a group of neurosurgeons, do you have knowledge of the standard that is followed by internists, general practitioners, general surgeons and family doctors in this area with regard to the diagnosis and treatment of symptoms similar to Mr. Chumbler's . . .

BY THE COURT: Just let me ask him—Dr., is this condition we are talking about, is it a medical condition which based on the local standards of this community falls primarily in the field of neurosurgery?

A. No, sir.

. . . . . .

Q. Then I believe I asked you, are you familiar with the standard that is followed by internists, by general surgeons and family practitioners, just plain old doctors in this area, in treating these conditions and prescribing Premarin?

A. I am not nearly so familiar with that and . . .

BY THE COURT: Well, now, Doctor, I don't mean to be abrupt about this matter, but in this matter I think you are going to have to say either you are or you are not.

A. Well, I am not.

**Page 119:**

Q. Dr. Hester, you didn't intend to tell the jury, did you, that Dr. McClure

didn't use the standard of care requisite for neurosurgeons in this community in diagnosing the man's condition, did you?

A. No, sir, I did not.

Q. . . . Now, he had a different idea about the medication that might be used from your own ideas, I understand it?

A. Yes, he did.

. . . . . .

Q. Are you saying he was violating the professional standards in the community in prescribing it [Premarin], doctor?

A. Well, I think I have already answered that question earlier when I said the standard in our community was not to prescribe Premarin for cerebral vascular insufficiency and to my knowledge none of us do. Now whether this is just opinions or whether you are going to call this the standard, I don't know how you are going to arrive at that. In Memphis, maybe the neurosurgeons do, I don't know, but here we don't go so far except for Dr. McClure.

Q. All right, but now you are aware that it is widely used by many doctors for many different things, aren't you?

A. Yes, sir.

Q. All right, isn't it a matter of medical judgment which drug to prescribe in the last analysis?

A. It certainly is.

### Testimony of Dr. Gerald Fenichel, p. 309:

Q. Doctor, is it your opinion and within that, that Premarin is accepted therapy for cerebral vascular insufficiency?

A. No, it is not.

Q. Is there anyone in this community of neurologists or neurosurgeons that you have knowledge of that uses Premarin in the treatment of cerebral vascular insufficiencies?

A. I can only speak for the neurologists in the city. There are nine. At our last society meeting, of which seven were present, all said they had never used Premarin for the treatment of cerebral vascular insufficiency . . .

BY THE COURT: . . . Are you saying, doctor, that it's ineffective, is that what you are saying?

A. It has never been demonstrated to be effective as a treatment for cerebral vascular insufficiency.

### Page 334:

Q. In the treatment of cerebral vascular problems as it existed beginning in April, 1971, am I correct in assuming there was an honest difference of opinion as to the various approaches among the specialists at that time?

A. Are you referring to all the treatments or just the estrogen therapy?

Q. Any kind of treatment.

A. There have been—that is correct, there is no specific established treatment for cerebral vascular disease.

Q. And especially, some general practitioners honestly disagree as to whether or not there was one proper approach to it?

A. I think they all agreed there was no one established approach.

### Page 336:

BY THE COURT: All right, based on the standard that existed in this community in April of 1971, now go ahead and finish your question.

(By Mr. Brabson, continuing)

Q. Was Premarin a drug to use in cerebral vascular insufficiency?

A. . . . to the best of my knowledge, Dr. McClure was the only person in the community using Premarin in the treatment of cerebral vascular disease.

### Testimony of Dr. Oscar F. Nowell, p. 401:

Q. In your opinion, has Premarin been or can it be an effective medication for the prevention of strokes?

A. In my way of thinking, yes.

Q. Have you ever used Premarin?

A. Oh, yes, I've used it for many years.

Q. And have you—

A. But not for that purpose.

Q. All right, sir, have you ever used Premarin for heart problems?

A. No, I am not a cardiologist . . but I do know it has been recommended for this purpose.

Q. And you do know that it is being used locally for this purpose?

A. Yes, sir.

**Page 399:**

BY THE COURT: Doctor, do you know the standard of medicine in this area with reference to whether or not —I mean with reference to the standard in the medical practice in Nashville, Tennessee?

A. Yes, sir.

BY THE COURT: All right.:

(By Mr. Moody, continuing)

Q. Doctor, do you know whether or not, basing your knowledge upon the factors that you know about in the practice of medicine in Davidson County, Tennessee, is Premarin used for the treatment of cerebral vascular insufficiency?

A. Yes, sir.

Q. How is it used and why is it used for that purpose?

A. . . . Now the important thing is to enlarge the diameter of these blood vessels so that more blood can get through and at the same time use some kind of drug that will decrease the physiological age of these blood vessels.

Q. Is Premarin one of the drugs?

A. And one of these drugs is Premarin to reduce the physiological age of the blood vessels in question . . .