John A. WOOTEN, et al., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 80–2064–H.

United States District Court,
W.D. Tennessee, W.D.

July 7, 1982.

Jack D. Kopald, Everett B. Gibson, Memphis, Tenn., for plaintiff.

W. Hickman Ewing, Jr., U.S. Atty., Joe A. Dycus, Asst. U.S. Atty., Memphis, Tenn., for defendant.

MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF JUDGMENT AGAINST THE UNITED STATES OF AMERICA

HORTON, District Judge.

This case arises under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), 2671 *et seq.* The issue before the Court is whether the Veterans Administration Hospital, Memphis, Tennessee, was negligent in failing to adequately supervise, care for and otherwise prevent injury to an 83 year-old heart patient who, during the night of October 4, 1977, was found lying in a hallway of the hospital, outside his room, unconscious with later determined severe head injuries which required brain surgery. The Court finds, from all the proof in the record, the VA was negligent and assesses damages against the United States in the sum of $80,000.00.

John A. Wooten, an 83 year-old resident of Parkin, Arkansas, was admitted to the Veterans Administration Hospital (VA), Memphis, Tennessee, on September 29, 1977, complaining of chest pain. He was treated in the Intensive Care Unit (ICU) of the hospital for an acute myocardial infarction.

On October 3, 1977, Mr. Wooten was transferred from ICU to room 1037 of the hospital. Due to Mr. Wooten's weak physical condition, his wife, Mrs. Leafy F. Wooten, asked an attending physician if she could remain with her husband at night. Permission was denied because Mr. Wooten was in a double ward. The next day, October 4, 1977, around 11:30 a.m., Mrs. Wooten was called to the hospital. She was informed Mr. Wooten was found unconscious about 1:00 a.m., on October 4, 1977, in the hall on the floor near his room. As a result of the fall and resulting injury, brain surgery was necessary.

The complaint alleges that negligence of the hospital's employees in failing to adequately supervise, care for and otherwise prevent Mr. Wooten from getting out of his bed, or attempting to do so, was the proximate cause of Mr. Wooten's fall and resulting injuries. Specifically, plaintiff alleges VA personnel attending Mr. Wooten negligently failed to raise the side rails on Mr. Wooten's bed and that failure along with inadequate supervision and care constitutes the proximate cause of Mr. Wooten's injuries.

The complaint demands judgment against the United States in the sum of $300,000.00.

The parties stipulated the following facts:

1. On September 29, 1977, at approximately 4:40 p.m., John A. Wooten, age 83, was admitted to the Veterans Administration Hospital in Memphis, Tennessee, complaining of chest pain.

2. After admission, and until 12:45 p.m., on October 3, 1977, Mr. Wooten was treated in the intensive care unit for an acute myocardial infarction.

3. At approximately 12:45 p.m. on October 3, 1977, Mr. Wooten was transferred by stretcher to a two-bed room on Ward 10 South at the VA hospital. His condition was improved and was characterized as "stable." Mr. Wooten's activity level had been increased from strict bedrest to "bedrest with bedside commode, up in chair three times per day," which was his allowable activity level at the time of the fall.

4. At approximately 12:20 a.m. on October 4, 1977, Mr. Wooten was found unconscious on the floor outside of his room.

5. As a result of the fall, Mr. Wooten suffered a fractured skull with subdural and cerebral contusion. Brain surgery was performed on October 5, 1977. Mr. Wooten remained in the VA hospital until he was discharged on March 29, 1978.

6. Upon admission to the intensive care unit, Mr. Wooten's condition was characterized as "guarded." He was given three milligrams of morphine (a narcotic sedative) for chest pain at approximately 4:45 p.m. on September 29. Beginning that day and continuing to the time of his fall, Mr. Wooten was also given Colace (a stool softener), Heparin (a blood thinner or anti-coagulant), and possibly Esidrex (a diuretic, the record being unclear). At either 5:00 a.m. or 5:00 p.m. (the record being unclear) on October 3, 1977, Mr. Wooten was given four milligrams of morphine sulfate for chest pain.

7. Mr. Wooten suffered permanent injury as a result of the fall. At the time of his discharge in March, 1978, he suffered from speech aphasia (loss of power to use words caused by brain injury) and a general, partial paralysis of the right side. He was able to walk only with assistance and was forced to wear an external catheter at night.

8. Mr. Wooten's bed in the ward room was equipped with side rails. These rails were not in their raised position prior to the accident.

9. Mr. Wooten was born on April 24, 1894. At the time of the accident, he was eighty three years of age and had a life expectancy of 5.21 years. He is now eighty-seven years old and has a life expectancy of 4.11 years.

10. If admitted to a nursing home, skilled care in a semi-private room would cost Mr. Wooten $1,000 per month.

The proof is substantial in the record that everyone associated with Mr. Wooten's care on the ward urged him to remain in his hospital bed. He was told that he should not get out of bed. The doctor's orders required him to remain in bed but allowed him to sit up on the side of his bed three times daily. While neither a catheter or an external urinal was required, a bedside commode was provided for Wooten's use. The evidence is that Mr. Wooten's wife told him to remain in bed. If he needed assistance, he was told to use the nurse's call button. Those witnesses testified that at the time Mr. Wooten was told to remain in bed, he was alert, oriented and appeared to understand the instructions given to him. Consequently, Mr. Wooten's bed was left in a low position. His bed was equipped with bed rails. However, the bed rails on his bed were not raised and sometime during his first night on the ward Wooten apparently got up, walked a short distance and fell, striking his head and suffering a severe head injury requiring brain surgery. He has never recovered from the results of that injury.

*Mrs. Leafy F. Wooten,* age 69, wife of John A. Wooten, testified that she has been appointed legal guardian of her husband by

the Probate Court at Parkin, Arkansas. She said he is incapable of handling his legal affairs, his money or making decisions.

Mrs. Wooten said Mr. Wooten was born April 24, 1894. Before this incident, he worked his garden, fished a lot, worked at a barber shop and helped out in their small used furniture shop. She said he had a heart attack in 1976 but that attack did not restrict him.

On September 29, 1977, Mr. Wooten told her his chest was hurting. She drove him to the VA hospital in their pick-up truck. He was placed in ICU where she was allowed to visit him ten minutes every hour. On October 3, 1977, he was moved to a room on the 10th floor of the hospital. When she visited him in his room, he was in good spirits, talking, laughing. While she was there, the nurses helped him sit upon the side of his bed. He was being given oxygen and had an IV inserted in his arm. After sitting on the side of the bed about fifteen minutes, she said he became tired.

Mrs. Wooten said she asked Dr. Beckemeyer, an attending physician, if she could stay with Mr. Wooten. She said she was afraid something might happen to him since they had transferred him from ICU so quickly. Dr. Beckemeyer denied her request, telling her it was against regulations for her to stay in a semi-private room. She remained with Mr. Wooten until visiting hours ended at four o'clock in the afternoon.

Before she left Mr. Wooten in his hospital room, she told him not to get up from his bed unless a nurse came in. She showed him how to use the nurse's call button. He seemed to be alert and understood those instructions as he had been in a hospital before. She said Mr. Wooten was able to carry on an intelligent conversation. He told her he felt better and asked her about his monthly check. He was in good spirits.

She said she did not see Mr. Wooten again until she was called to the hospital just before noon on October 4, 1977. She said Mr. Wooten was tied down, that he was shaking all over, and he did not know anything. His eyes were closed. He did not respond to her. She said Dr. Beckemeyer informed her immediate brain surgery was required because of brain injury resulting from the fall, that his temperature was high and there was a fifty-fifty chance of Mr. Wooten living or dying. She saw her husband again early in the morning of October 5, 1977. At that time, he was again in ICU with his head bandaged and a needle in his arm. She said, "he just looked like dead to me."

Mrs. Wooten said that she carried Mr. Wooten home from the hospital on March 3, 1978. He was just lying there. She said she could not talk to him and he could not respond to her. She said he hollered continuously.

When Mr. Wooten arrived home, he could not dress or feed himself. He could not talk or walk. He could not understand what was said to him. He later was able to button his shirt but could not use his hand where "they let that needle get out into it." He can feed himself slowly with his left hand. His right arm is "sort of paralyzed." It was a long time before he could walk "just a little" by himself.

She said Mr. Wooten has fallen out of bed, fell in the yard and once fell and fractured his "tail bone." She said he falls like a child and she has to watch him all of the time.

Mr. Wooten's condition has deteriorated in the last few months. Mrs. Wooten stated that she has had to move from Parkin, Arkansas, to Pocahontas, Arkansas, so that her daughter can help her attend to the needs of Mr. Wooten.

In addition, Mrs. Wooten said Mr. Wooten:

1. Cannot write his name or hold a pencil.
2. She can understand very few words he says and he cries a lot.
3. He cannot talk to his children and grandchildren. He scratches his head when he tries to talk. He tried to talk with his brother at a family

reunion but withdrew from the family when he could not talk with them and they could not understand him.

4. She tried taking him to the barber shop where he used to go and play dominoes but his friends seemed uncomfortable around him there and that causes him to cry.

5. He cannot take care of his private hygienic needs. She has to care for him.

6. When a catheter was required, it was very painful to Mr. Wooten.

7. He yells because of pain.

8. He has gotten worse instead of better.

9. The Veterans Administration is paying Mr. Wooten $206.25 per month because of his injury and disability.

*Johnnie Mae Wooten Powers*, testified that she is the daughter of Mr. Wooten and that she lives in Pocahontas, Arkansas. Mrs. Powers said her father was an active man who had always worked. He hunted squirrels, rabbits, fished and enjoyed his garden. He liked visiting his friends at a local pool hall. He worked in the furniture shop with his wife. She said Mr. Wooten has difficulty eating and dressing himself. He has trouble swallowing. He cannot take care of his personal hygienic needs. She cannot understand his talk. It is, she said, "a bunch of gibberish."

Mrs. Powers said that when she saw her father, after the accident and before the brain surgery, he was tied down in bed. He was jerking all over. He was unconscious and did not respond to her. After brain surgery, he was in the hospital about four months. He suffered pain and kidney trouble after leaving the hospital. On the use of the nurse's call button, she said she thought her father knew how to use the button.

*Dr. Thomas G. Ferguson, M.D.*, Chief of Internal Medicine at the South Louisiana Medical Center, Houma, Louisiana, testified that in September and October of 1977, he was Chief Medical Resident at the VA hospital in Memphis, Tennessee. He said records showed that Mr. Wooten was admitted to the VA hospital on September 29, 1977. His admitting condition was guarded. In the spectrum of well to death, guarded condition means nearer to death than well. He said a guarded condition means the chance of something catastrophic happening is pretty real. The potential is there. He said Mr. Wooten was slightly hypertensive. His heart was enlarged and he had signs of heart failure. Wooten was given morphine for pain. Dr. Ferguson stated the medical records indicate that Dr. Joyce Gathings was called to see a patient who was found lying in the middle of the hall floor. That was at 1:00 a.m., on October 4, 1977. The patient, Mr. Wooten, was unconscious. Her initial impression was the patient had an extended myocardial infarction. She also ordered skull x-rays to be sure there was no trauma to the head. The records also showed that at 2:00 a.m., on October 4, 1977, under sensorium Mr. Wooten was alert and cooperative but combative. At 4:00 a.m., there was a ditto. Mr. Wooten was restrained at 6:00 a.m., because of being confused.

Dr. Ferguson stated that all VA beds are equipped with rails. Speaking on the use of bed rails, Dr. Ferguson testified:

Q. Do you know whether there had been any doctor's orders or any order to use them?

A. That is an implied order.

Q. You would think then there was an order implied that the rails be up for Mr. Wooten?

A. I would think so.

Q. Would this be one of the physician's orders?

A. This is more or less left to the nurse's discretion. Frequently she is there when the physician is elsewhere. If she finds the patient is combative or restless or confused or has an altered mental status, she would then go and see if the bed rails are up.

Q. Would you think in this situation that the bed rails were used?

A. I don't know.

Q. Do you think they should have been used?

A. In the point of time that the patient had an altered mental status, I would say, no. If the man is elderly, but certainly that is not an indication by itself to routinely put bed rails up. Generally the patients on whom you put bed rails up are those who are confused and agitated, and will do harm to themselves or others or who in some way have a motor disability either paraplegic or who has had a stroke. Those are the ones that you would ordinarily put the bed rails up for.

*Dr. William B. Bekemeyer, Jr., M.D.,* Chief of Medicine Resident at the University of Tennessee Center for the Health Sciences, testified that he saw Mr. Wooten on October 1, 1977. At that time, he was recuperating from an acute myocardial infarction. He said Mr. Wooten was given Heparin twice a day, Esidrex daily and Oxygen by nasal cannula. He was also given morphine; a stool softener and Dalmane.

Regarding bed rails, Dr. Bekemeyer testified:

Q. To your knowledge does the Veterans Hospital or did it at that time have any written procedure concerning the use of bed rails or restraints on any patient?

A. I don't know.

Q. Did you follow any unwritten procedure?

A. No.

Q. How did you decide whether bed rails would be used?

A. If a patient were confused or disoriented, I would request that the bed rails be kept elevated or the patient be restrained.

Q. Would the use of bed rails come only from the treating physician, from yourself, or could one of the nurses decide that bed rails be used?

A. The nurses can institute that.

Q. After Mr. Wooten was transferred to the ward, were bed rails used?

A. I do not know.

Q. If they were used, would that appear in the record?

A. It might or might not.

Q. What about the use of restraints?

A. The use of restraints is usually noted at least when they are put on, not necessarily every shift thereafter.

Q. Reviewing the record and recalling what you do recall about Mr. Wooten's condition, was there any reason to have bed rails up on his bed after he was transferred to the ward?

A. Not to my knowledge.

Q. Do you recall whether he had been instructed in any way after he was moved to the ward that he should not try to get out of bed on his own?

A. I do not remember that.

Q. Would that appear in the record if there was such an instruction?

A. It might be, but not necessarily.

*Terry Crass, R.N.,* testified that he is employed by the VA hospital in Memphis, Tennessee, and has been a Registered Nurse for about eight years. He said he very much remembered Mr. Wooten. He said that when he saw Mr. Wooten, his bed was low and Mr. Wooten appeared to be alert, oriented and coherent. In determining whether side rails on a hospital bed should be used, Mr. Crass answered the following questions:

Q. Now, what criteria is used to decide whether or not bed rails should be up on patients?

A. Okay. Basically if that patient is confused, if that patient is disoriented, if that patient is agitated or if that patient is unconscious, those rails go up. The rails are used to keep the patient from falling out of bed.

Q. Okay. Based on your observations of Mr. Wooten at that time and during the period of time that you were on October 3, 1977, did he exhibit any of those characteristics which would indicate that the rails ought to have been up?

A. No, sir, not to me.

Q. Okay. Is age a factor to consider, one of the factors that you take into account?

A. Thank heaven all eighty-two year olds are not alike, and this is my criteria. I assist the patient, not the age.

Q. Different eighty-two year olds are treated in different ways. Is that what you are saying?

A. Every individual is different.

*Gloria Wiggins, R.N.*, testified that she held a head nurse position at the VA hospital from December, 1973, until May of 1980. She said Mr. Wooten was alert, cooperative and coherent. In fact, she asked Mr. Wooten if he knew a friend of hers who lived in Parkin, Arkansas. Mr. Wooten did know the person. Relating why she did not think it necessary to raise the side rails on Mr. Wooten's bed, Mrs. Wiggins testified as follows:

Q. Did you see fit, Mrs. Wiggins, or did you think it was necessary back on October 3, 1977, to raise the bed rails on Mr. Wooten?

A. No, I did not.

Q. Why did you not think it was necessary?

A. Because he was alert. He comprehended my instructions. I understood that he comprehended what I was saying, and I did not feel that at one o'clock in the afternoon it was necessary to raise the rails on his bed.

Q. If he had remained in that condition up until bedtime, in your judgment, on October 3, 1977, would it have been necessary if his condition had not changed to have raised his bed rails?

A. No. If he had remained as he was, I would not have raised them at bedtime.

*Laura Stanton, R.N.*, testified that in October of 1977, she was assigned to work Ward 10 South from 1:30 p.m. until 10:00 p.m. She recalls Mr. Wooten being transferred from ICU to Ward 10 South between 3:00 p.m. and 4:00 p.m. She identified Mr. Wooten in Court.

Mrs. Stanton said Mr. Wooten was hard of hearing and she had to repeat for him that the doctor did not want him to get out of bed. She said Mr. Wooten nodded and said he knew that he should not get up. Mrs. Stanton said she told Mr. Wooten about the call button. She testified that Mrs. Wooten, who was also present, told Mr. Wooten that hospital personnel did not want him to get up. Stanton said Mr. Wooten was alert, cooperative, oriented and had no pain.

Mrs. Stanton said she did not put up the side rails because Wooten was alert, oriented and had no trouble getting up. Had he given any trouble, she said she would have put the side rails up. Also, she said she would have put up the rails if Wooten had not understood her instructions. She said deciding whether to put up bed rails is a matter of judgment. Age alone does not always indicate need for side rails. If the elderly patient is alert and oriented, she would not consider side rails. She said hospital personnel have to take the patient's condition into consideration. They have to make a judgment. She said there have been patients where side rails were a disadvantage. In summary, Mrs. Stanton said, we just don't use side rails if we have a patient who is alert and oriented.

Mrs. Stanton was asked and answered the following question:

Q. And when that patient is eighty-three years old and when he has—he is in that weakened condition and he hadn't been on his feet for four and a half days, would it be helpful for him to have a reminder if he woke up in the night that he needs to punch the call button for assistance?

A. Yes.

*Sally Nethery, R.N.*, Assistant Director of Nursing, Baptist Hospital, Memphis, Tennessee, testified that Baptist Hospital operates about 1500 beds. She said the policy regarding use of side rails at Baptist Hospital states that side rails are to be used for patients who are irrational, confused or as indicated by the patient's condition. Testifying on whether nurses exercise discretion in determining the need for side rails, Mrs. Nethery answered the following questions:

Q. I gather that the nurse who is caring for the patient is given some judgment

exercise that she must make in determining whether the patient's condition warrants the use of side rails?

A. That is right.

Q. And certainly if it is apparent from the patient's condition, regardless of whether the patient be either irrational or confused, but if it is apparent from other factors that the patient needs an extra safety precaution, then the nurse should in that event use the side rails. Is that correct?

A. Yes.

*Cornelia Christensen, R.N.,* Assistant Vice President for Nursing at Methodist Hospitals, Memphis, Tennessee, testified that Methodist Hospitals admit over 20,000 admissions each year and operate 1300 hospital beds. Ms. Christensen stated the policy regarding side rails on beds at Methodist is:

Side rails are attached to all beds. They are to be in an up position at all times on all patients who have received sedation or narcotics. They are to be in an up position on all patients before the hour of sleep.

She said that policy was in effect at Methodist all during the year of 1977. She stated the purpose of side rails on hospital beds is to keep patients from inadvertently slipping out or to remind them that they are to get assistance when getting up. The side rails, she testified, remind patients not to get out of bed.

*Carol Eubanks, R.N.,* West Palm Beach, Florida, testified that in October of 1977, she was employed as a Registered Nurse at the VA hospital in Memphis, Tennessee. She was on duty the night of October 4, 1977, when Mr. Wooten was discovered on the floor of the hall. She said:

Shortly after midnight we were there listening to a report, and we heard a noise like someone falling out in the hall near the nurses' station, so we stopped and went into the hall and found Mr. Wooten lying in the hall.

His head was facing in the direction of the nurses' station. The noise she heard sounded like a loud thump or a loud thud.

She said Mr. Wooten was unresponsive to verbal stimuli and no answer came from him. Dr. Joyce Gathings was called. Mr. Wooten was returned to his bed and examined by Dr. Gathings. Testifying on the use of bed rails, Ms. Eubanks responded:

Q. Couldn't it have been helpful to have the bed rails up at night to remind Mr. Wooten, should he awake at night, that he should not attempt to get out of bed alone?

A. Yes.

Q. Isn't that one purpose for bed rails?

A. To remind them to stay in bed?

Q. Yes.

A. Yes.

Q. So that isn't it true that it is often that rails are put up at night so that a sleepy or drowsy patient who awakens will be reminded to call for assistance if he wants to get up?

A. Yes.

The plaintiff offered as an expert witness, *Angelia Veyhl, R.N.,* who offered three specific reasons that would alert a nurse to consider the use of safety devices on a patient's bed. Those specific reasons are age, diagnosis and medication.

Mrs. Veyhl testified the medical records show that Mr. Wooten was prescribed various medications including Morphine Sulphate, Colace, Milk of Magnesia, Lidocane, Dalmane, Heparin and Esidrex. She said that Morphine Sulphate is a narcotic and has a depressant effect on the central nervous system. It could produce results in a patient from dizziness and drowsiness to being completely unresponsive respiratorily. Heparin is an anticoagulant and prevents blood clot. Esidrex is a diuretic and causes a person to urinate frequently. Although the record does not show when Esidrex was administered to Mr. Wooten, Ms. Veyhl testified the medical records show that Mr. Wooten's blood pressure was going down and his urine output was voluminous. Dalmane, a sleeping medication, was also prescribed.

This witness also testified to a condition called sundown syndrome. She said that

elderly people have a tendency to get disoriented as the sun goes down. It has a lot to do with loss of sensorium that they get at night when there is not much activity or they are not as alert as to what is going on about them.

On the point of using side rails on hospital beds, Ms. Veyhl said that side rails are used specifically on hospital beds to prevent a person from turning over and turning out of the bed. Since hospital beds are not queen size, she said, it is a preventive measure. She said the rails also remind the patient that they are not supposed to get up. Based upon her education, knowledge, experience and a review of Mr. Wooten's medical records, Ms. Veyhl testified the prudent practice of the standard of nursing that is acceptable among professionals was not adhered to in this case. Ms. Veyhl said it was the responsibility of all people who were concerned with the care of Mr. Wooten to make sure that his safety precautions were implemented.

 This is an action pursuant to the Federal Tort Claims Act, and the applicable substantive law of liability is that of the state where the alleged act of negligence occurred, here in Tennessee. 28 U.S.C. § 2674. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1961). It is grounded on the theory of negligence. [A] recovery based on a theory of negligence requires proof of more than a negligent act. The elements necessary to recover are: (a) *negligent act* which (b) *causes a* (c) *loss.* *German v. Nichopoulos*, 577 S.W.2d 197 (Tenn.App.1978).

 The cases of *Ford v. Vanderbilt University*, 289 S.W.2d 210 (Tenn.App. 1955) and *White v. Baptist Memorial Hospital*, 363 F.2d 37 (6th Cir.1966), citing *Spivey v. St. Thomas Hospital*, 31 Tenn. App. 12, 211 S.W.2d 450 (1947) and *O'Quinn v. Baptist Memorial Hospital*, 184 Tenn. 570, 201 S.W.2d 694 (1947), seem to indicate that a reasonable standard of care for a patient is required of hospitals in Tennessee. The Court finds the evidence in this case sufficient to raise a duty upon VA hospital personnel attending Mr. Woo-

ten to use reasonable care to protect him from getting out of bed and injuring himself. The Court finds the VA hospital breached that duty of reasonable care and, in doing so, was negligent in the care of Mr. Wooten.

The nurses attending Mr. Wooten testified he was alert, oriented and cooperative and raising the bed rails was unnecessary. Yet, on the other hand, those same nurses said the bed rails would have been useful in warning Mr. Wooten not to get out of bed but to call for assistance. Mrs. Stanton, R.N., said it would have been helpful to have the rails up as a reminder to Mr. Wooten not to get up but use the nurse's call button for assistance. Ms. Nethery, R.N., testified if the patient needed an extra safety precaution the nurse should use the side rails. Ms. Eubanks, R.N., said bed rails would have been helpful to remind Mr. Wooten, should he awake at night, that he should not attempt to get out of bed alone and should call for assistance. When Mr. Wooten was sent to the 10th floor room from the Intensive Care Unit, he had not been out of bed since he entered the hospital. Everyone was concerned that Mr. Wooten remain in bed, his physician, his wife, his daughter, his nurses. This total concern persuades the Court that it was only reasonable for hospital personnel attending Mr. Wooten to put up the bed rails as a precautionary measure to help guard against the possibility of Mr. Wooten attempting to get out of bed. If all of the hospital nurses and attending physicians were concerned that this 83 year old patient remain in bed, then it seems elementary to the Court that the rails on Wooten's hospital bed should have been raised. Failure to use the bed rails, considering this patient's age, physical condition and medication was just plain negligence.

Nurses testified that one reason for using bed rails is to remind a patient that he should not get out of bed. If he needs to get up, he should call for assistance.

Further testimony of record indicates that elderly patients experience a condition called sundown syndrome. That refers to

the possibility of elderly patients becoming disoriented and confused after sundown.

It is therefore reasonable to conclude, from the evidence in this case, that Mr. Wooten may well have become confused during the night, his first night on the 10th floor of the hospital and not in ICU where he received constant 24 hour attendance and monitoring. Ms. Veyhl, R.N., said the care given by VA personnel in this case did not meet the standard of care which is acceptable among professionals in the medical field, specifically nursing care.

■ The Court will admit the opinion of Ms. Veyhl as that of an expert witness on this subject. At first, the Court expressed some doubt about her qualifications as an expert witness in this case. Rule 702, Fed. R.Evid. provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The Advisory Committee notes state the Court should view the expert witness not in a narrow sense, but as a person qualified by knowledge, skill, experience, training or education. Ms. Veyhl meets that standard.

*Thompson v. Methodist Hospital*, 211 Tenn. 650, 367 S.W.2d 134 (1962) indicates a community standard is also applicable to hospitals in Tennessee. *Thompson* states at page 138:

> The measure of duty of a hospital is to exercise that degree of care, skill and diligence used by hospitals generally in that community, and required by the express or implied contract of the undertaking.

■ The evidence in this case shows the standard of care rendered Mr. Wooten did not meet the standard of care rendered patients in other large Memphis hospitals. The VA hospital was therefore negligent in this regard.

The policy at Methodist Hospitals is that side rails are to be in an up position on *all* patients before the hour of sleep. Obviously, this standard of care was not met. The policy at Baptist Memorial Hospital is that side rails are to be used for patients who are irrational, confused or as indicated by the patient's condition. The proof shows that Mr. Wooten's condition mandated the use of side rails. Everyone who was concerned with Mr. Wooten told him not to get out of bed. His wife told him not to get up unless a nurse was present. All of the nurses attending Mr. Wooten testified that he was so instructed. The Court finds that all of this stated concern for Mr. Wooten's safety surely indicated that at least the side rails on Mr. Wooten's bed should have been raised. Dr. Ferguson said the use of bed rails is an implied order. Dr. Beckemeyer stated that he did not know whether the VA hospital had any written procedure concerning the use of bed rails or restraints on patients.

The Court therefore concludes that, as a matter of law, the VA hospital in Memphis, in attending Mr. Wooten, breached its duty of reasonable care and also failed to meet that degree of skill, care and diligence rendered by hospitals generally in the Memphis community, specifically Methodist Hospitals and Baptist Memorial Hospital.

■ Defendant contends that the plaintiff should not prevail because, by getting up by himself, contrary to the hospital's instructions, he assumed the risk of any injury resulting therefrom and contributed to his own negligence. This contention is without merit. An eighty-three year old patient, who has just suffered a heart attack, and who has been under medication, is in the hospital because he cannot adequately care for himself. The hospital has a duty to protect him from harm. The proof shows that the plaintiff was under a great deal of medication, and was in no condition to make a reasoned judgment. The hospital's duty was to take all reasonable precautions under the circumstances.

Defendant also contends that even if the Court finds that the defendant was negli-

gent, there is a lack of proof that this negligence was the proximate cause of the plaintiff's injuries. Defendant contends that the bed rails, while they might keep someone from rolling out of bed, would not keep one from purposely climbing out of bed. The proof is clear, however, that bed rails do help by reminding a patient that he should call a nurse if he needs to get out of bed. This is especially helpful, the proof shows, when dealing with aged patients, who often wake up in the night confused and disoriented. "The issue of proximate cause is one to be decided 'upon mixed considerations of logic, common sense, justice, policy and precedent.' *Mullins v. Seaboard Coastline Railway Co.*, 517 S.W.2d 198, 201 (Tenn.App.1974)" *Wyatt v. Winnebago Industries, Inc.*, 566 S.W.2d 276 (Tenn.App.1977).

> In Tennessee, proximate cause has been described as that act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another which, if it had not happened, the injury would not have been inflicted.

*Tennessee Trailways, Inc. v. Ervin*, 222 Tenn. 523, 438 S.W.2d 733 (1969).

■ The proof, and all logical inferences therefrom show that the omission by the hospital of putting up the plaintiff's bed rails failed to prevent the accident by either keeping him from leaving the bed, or by failing to remind him to call a nurse.

■ In making a determination of appropriate damages, the rule in Tennessee states:

> While no mathematical rules of computation have ever been formulated making verdicts and judgments uniform in negligence cases, it is the duty of the courts to take into consideration the nature and extent of the injuries, the suffering, expenses, diminution of earning capacity, inflation and high cost of living, age, expectancy of life and amounts awarded in other cases.

*Monday v. Millsaps*, 37 Tenn.App. 371, 264 S.W.2d 6 (1953). See also *Clinchfield Railroad Company v. Forbes*, 57 Tenn.

App. 174, 417 S.W.2d 210 (1966) and *Holt v. McCann*, 58 Tenn.App. 248, 429 S.W.2d 441 (1968), using the same language.

■ For pain and suffering, out of pocket expenses and possibly future nursing home care, the Court finds the sum of $80,000.00 to be reasonable.

The Court does not find it necessary to rule on the defendant's motion to strike Exhibit # 2 as it was not considered by the Court in reaching the decision it has in this case.

It is therefore by the Court

ORDERED that plaintiff John A. Wooten, et al., be granted judgment against the United States of America in the sum of $80,000.00.